ATTORNEY GENERAL v JOHN A BIEWER CO, INC

Docket No. 60865. Submitted November 9, 1984, at Lansing.—Decided January 2, 1985. Leave to appeal applied for.

The Attorney General of the State of Michigan, individually and on relation of the Natural Resources Commission, and the director of the Michigan Department of Natural Resources brought an action in Kalamazoo Circuit Court pursuant to the Thomas J. Anderson, Gordon Rockwell Environmental Protection Act of 1970 and water resources act against John A. Biewer Co., Inc., seeking injunctive and equitable relief, civil penalties and investigation costs arising out of groundwater pollution caused by defendant's treatment of lumber with a preservative solution containing chrome and arsenic. Defendant admitted that it had caused the groundwater and soil contamination, but argued that it had been unaware of that contamination until notified by the DNR. The trial court, Robert L. Borsos, J., in addition to ordering defendant to undertake measures to eliminate future pollution and remedy existing pollution, ordered defendant to pay $85,000 in civil penalties, to pay for the cost of hooking up to nearby landowners whose wells had been contaminated by the pollution from defendant's operation to a municipal water supply, and to pay to the Department of Natural Resources $26,923.79 as damages for the costs incurred by the state in investigating the pollution problem created by defendant. Defendant appeals, claiming that the trial court erred by imposing civil penalties on the basis of acts by defendant which resulted in pollution which occurred prior to the defendant's being notified by the DNR of the pollution problem, that the trial court erred in ordering the

REFERENCES FOR POINTS IN HEADNOTES

[1] 73 Am Jur 2d, Statutes §§ 194, 293-295.
[2] 36 Am Jur 2d, Forfeitures and Penalties § 8.
   61A Am Jur 2d, Pollution Control § 6.
[3, 5] 58 Am Jur 2d, Nuisances § 106.
   61A Am Jur 2d, Pollution Control §§ 538, 589.
[4] 5 Am Jur 2d, Appeal and Error § 822.
[5] 61A Am Jur 2d, Pollution Control §§ 554, 560.
   Liability for pollution of subterranean waters. 38 ALR2d 1265.
[6] 30 Am Jur 2d, Evidence §§ 991, 992, 995.

defendant to pay the cost of hooking up the adjoining landowners to the municipal water supply, and that the trial court erred in basing its determination of damages for the costs of the DNR investigation on a report of the costs of the various DNR divisions where the persons who supplied the figures which were incorporated into the report were not available at trial. *Held:*

1. The civil penalty provision of the water resources act does not limit the imposition of civil penalties to acts of pollution which take place after the polluter has been notified by the DNR that its activities have resulted in water pollution. The trial court could properly base its imposition of civil penalties upon any and all acts by the defendant which resulted in water pollution and did not err in failing to limit its imposition of such penalties to those acts resulting in water pollution which occurred after notification by the DNR.

2. Since the water resources act makes any violation of the prohibition against discharging injurious substances into the waters of this state prima facie evidence of a public nuisance and provides for the abatement of such a nuisance, the trial court could use any remedy which would be available in a public nuisance case. The ordering of defendant to connect the nearby landowners to the municipal water supply was a proper remedy, even though defendant had already had deeper wells drilled for those landowners, since there was evidence that there existed, even with the deeper wells, the possibility of further exposure to the contamination caused by defendant.

3. Since the person who testified as to the report which summarized the investigation cost figures supplied by the division chiefs of the various divisions of the DNR which had been involved in the investigation of defendant's pollution problem had no personal knowledge of the various cost figures, the report was hearsay evidence and should not have been admitted unless it could be said to fall within the public records and reports exception to the hearsay rule. Since the report was specially prepared for this litigation and was not a general report of the activities of the agency nor required by law, the public report and record exception is not applicable. The report should not have been admitted as an exhibit and the trial court erred in relying upon that report to determine damages due to the DNR for its investigative efforts.

Affirmed in part, reversed in part and remanded.

1. STATUTES — JUDICIAL CONSTRUCTION — UNAMBIGUOUS STATUTES — PENAL STATUTES.

A statute which is clear and unambiguous is not open to judicial

construction; a penalty provision in a statute should be strictly construed in favor of the person being penalized.

2. ENVIRONMENT — WATER RESOURCES ACT — CIVIL PENALTIES.

Application of the civil penalty provision of the water resources act is not limited to violations of the act which occur after the violator has been given notice by the Department of Natural Resources that it is violating the act; accordingly, a court in an action brought by the Attorney General pursuant to the water resources act may impose civil penalties on a violator of the act for all violations of the act irrespective of whether the violation occurred prior to or after notification of violation by the Department of Natural Resources (MCL 323.10[1]; MSA 3.529[1][1]).

3. ENVIRONMENT — WATER RESOURCES ACT — PUBLIC NUISANCES — REMEDIES.

A trial court in an action brought under the water resources act may grant "appropriate relief, including a permanent or temporary injunction" for any violation of the act or the rules promulgated thereunder; since the act treats violation of the prohibition against any discharge into the waters of this state of any substance which is or may become injurious to public health, safety or welfare as prima facie evidence of a public nuisance and provides for abatement of such nuisances, the scope of remedies available to a court in an action brought under the provisions of the act is governed by the law regarding public nuisances (MCL 323.6[c], 323.10[1]; MSA 3.526[c], 3.529[1][1]).

4. EQUITY — APPEAL — STANDARD OF REVIEW.

The Court of Appeals reviews *de novo* the decisions of trial courts in equity cases; however, great weight will be given to the findings of the trial court and those findings will be sustained on appeal unless the Court of Appeals is convinced that the findings of the trial court are clearly erroneous; the Court of Appeals will then review the record *de novo* to determine whether the equitable relief granted was appropriate in light of the circumstances.

5. ENVIRONMENT — WATER RESOURCES ACT — PUBLIC NUISANCES — REMEDIES.

A trial court in an action brought under the water resources act for a violation of that act by polluting of the groundwater may properly order, as part of the abatement of the resulting public nuisance, that the violator pay the cost of connecting nearby landholders who have wells to a municipal water system where there is evidence that, despite other efforts to avoid contamina-

tion of the water drawn from the nearby wells, there exists the possibility of exposure to the contamination caused by the violator by persons using the nearby wells.

6. EVIDENCE — HEARSAY — PUBLIC RECORDS AND REPORTS.

A report prepared by the Department of Natural Resources relative to the costs incurred in the investigation of a pollution problem is hearsay where the person preparing the report is not competent to testify as to the costs of the various divisions of the Department of Natural Resources that were specified in the report; such a specially prepared report is not admissible under the public records and reports exception to the hearsay rule, since such a report is not a general report of the activities of the agency nor a report required by law within the meaning of the public records and reports exception to the hearsay rule (MRE 803[8]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Stewart H. Freeman* and *Elizabeth L. Valentine,* Assistants Attorney General, for plaintiffs.

*Touma, Watson, Nicholson, Whaling, Fletcher & DeGrow, P.C.* (by *Gary A. Fletcher* and *Michael L. West*), for defendant.

Before: M. J. KELLY, P.J., and BEASLEY and M. R. STEMPIEN,* JJ.

BEASLEY, J. In a bench trial, judgment was awarded plaintiffs against defendant under the Thomas J. Anderson, Gordon Rockwell Environmental Protection Act of 1970[1] and under the water resources act.[2] Defendant was ordered to take measures to remedy a soil and groundwater pollution problem it caused and to pay civil penalties and damages. Defendant appeals as of right from the trial court's judgment.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.*

[2] MCL 323.1 *et seq.;* MSA 3.521 *et seq.*

The trial court held defendant liable for polluting the groundwater near defendant's plant in Schoolcraft, Michigan, with arsenic and chrome. The pollution was caused by defendant in the course of its wood preservative and fire retardant treatment of lumber in a process known as "Wolmanizing". The Wolmanizing process involved pressurized treatment of the lumber with a chemical solution containing chromic acid, cupric oxide and arsenic pentoxide.

Defendant began its Wolmanizing of lumber at the Schoolcraft plant in early 1970. Apparently, the Wolman solution seeped into the groundwater from various sources in the course of the Wolmanizing process. Eventually, the Michigan Department of Natural Resources discovered the pollution problem and informed defendant in August or October, 1979, that its discharge of the Wolman solution into the ground was illegal and should cease.

Defendant admitted it caused the groundwater and soil contamination in the course of its Wolmanizing process. One source of contamination occurred when lumber was soaked in treatment vessels containing the Wolman solution. After being removed from the treatment vessels, the lumber was allowed to drip dry onto either an asphalt pad or the ground.

Another source of contamination occurred when the Wolman solution was collected in door pits located in front of the treatment vessels. Some of the Wolman solution leaked into the ground below the pits because they were not sealed on the bottom. When the pits became full as a result of the draining of the solution from the treatment vessels and the addition of rainwater and other runoff, the pits would be pumped out onto the bare soil. The pits needed to be pumped out only period-

ically because they leaked and there was some evaporation. The manager of defendant's Schoolcraft facility testified that the pits were pumped out approximately 10 to 15 times per year.

Still another source of contamination was the burying by defendant of materials carrying the active ingredients of the Wolman solution. Prior to 1975, the active ingredients of the Wolman solution were delivered to defendant in the form of salts packed in small sealed barrels. The barrels were buried, along with broken lumber, paper and other trash, at the site of the Schoolcraft facility.

Defendant's manager testified that he did not become aware of the groundwater contamination problem until after he learned that a water quality specialist with the DNR had come in to examine the water in the door pits. However, the trial judge found that defendant knew of the dangerous nature of the chemicals used in the Wolmanizing process because each load of Wolman chemicals was labeled with the word "poison" and bore the skull and crossbones symbol. Defendant's manager admitted that a notice of the poisonous nature of the chemicals accompanied each shipment. In addition, he admitted that the notices stated "do not contaminate waters used for domestic consumption, irrigation, or fish and wildlife". The manager also admitted receiving materials from the supplier of the Wolman solution which recommended procedures for cleaning up spills or leaks and also informed of the poisonous nature of the chemicals. The document containing the recommended safety procedures was sent to defendant in 1975.

The chrome and arsenic which caused the contamination are considered toxic substances. The United States Environmental Protection Agency and several health organizations set the maximum safety level of chrome and arsenic for community

drinking water supplies at 50 parts per billion. Arsenic and chrome were found near defendant's facility at levels greatly exceeding the maximum safety level.

The trial court appointed and expert to investigate the pollution problem and to testify regarding the nature and extent of the problem. The expert indicated that a chrome "plume", which is an area of groundwater containing in excess of 50 parts of a chemical per billion, existed on the southeast portion of defendant's property and extended beyond the property in that direction. He testified that the plume is known to extend at least 900 feet to the southeast of the property and could extend to as far as 3,000 feet.

The supervisor of the Hazardous Wastes and Litigation Branch of the Environmental Enforcement Division of the DNR testified that the groundwater contamination caused by defendant's Schoolcraft facility resulted in the contamination of four sources of drinking water near the facility. Two wells located on defendant's property were contaminated, as was the well supplying drinking water to a residence owned by Larry M. Weslock, located directly across the street from defendant's plant. Also, a well serving the nearby Weiss Trucking Company was contaminated.

After filing a written opinion, the trial court entered judgment in favor of plaintiffs, ordering defendant to pay $85,000 in civil penalties for its violations of law and for creating a public nuisance. In addition, defendant was ordered to dispose of the contaminated soils on its property, to install observation wells to keep the contaminated groundwater under observation, and to install purge wells to remove the contaminated groundwater. To prevent any further problems with the operation of the Schoolcraft facility, the trial judge

ordered defendant to implement an approved "pollution incident prevention plan", as required by the rules promulgated under the water resources act (WRA). Defendant was also ordered to hook up both the Weslock residence which, as indicated, was across the street from defendant's plant, and the Weiss Trucking Company facility to the Village of Schoolcraft's water supply system.

Finally, defendant was ordered to pay the State of Michigan a sum of $26,923.78 as damages for the costs incurred by the state in investigating the pollution problems created by defendant. The evidence relied upon by the trial court in awarding the $26,923.78 to the state was a summary of wages and other costs from departments within the DNR allegedly incurred in investigating defendant's case.

On appeal, defendant raises three issues. First, defendant claims that the trial court erred in imposing civil penalties for violations of the WRA occurring before defendant was notified it was violating the law.

The water resources act was enacted to create a water resources commission to protect and conserve the water resources of the state. MCL 323.3; MSA 3.523 vested the commission with the power to bring actions to enforce the laws relating to the pollution of water. By Executive Orders 1972-3 and 1976-8, this power, along with others, was transferred to the DNR. Pursuant to MCL 323.10(1); MSA 3.529(1)(1), the DNR exercised the authority vested in it by the executive orders and requested the Attorney General to commence the present civil action to obtain appropriate relief for defendant's violations of the act. As part of that relief, as indicated above, the trial court imposed an $85,000 civil penalty upon defendant pursuant to

MCL 323.10(1); MSA 3.529(1)(1), which statute provides:

"The commission may request the attorney general to commence a civil action for appropriate relief, including a permanent or temporary injunction, for a violation of this act or rules promulgated hereunder. An action under this subsection may be brought in the circuit court for the county of Ingham or for the county in which the defendant is located, resides, or is doing business. The court has jurisdiction to restrain the violation and to require compliance. In addition to any other relief granted under this subsection, the court may impose a civil penalty of not more than $10,000.00 per day of violation."

Defendant argues that this Court should construe this statutory provision as limiting the trial court's authority to impose civil penalties to violations occurring after the violator has been given notice by the DNR that it is violating the act. We do not accept the construction of the statute advocated by defendant.

A statute which is clear and unambiguous is not open to judicial construction.[3] A penalty provision in a statute should be strictly construed in favor of the person being penalized.[4] The clear language of this statute does not appear to limit the imposition of civil penalties to those violations occurring after the polluter is notified.

The fact that MCL 323.9; MSA 3.529 limits the imposition of criminal penalties to violations occurring after service of a written notice of determination pursuant to MCL 323.7(2); MSA 3.527(2) does not support defendant's argument. In fact, it can be argued that the criminal provision detracts

---

[3] *Lake Carriers' Ass'n v Director of the Dep't of Natural Resources,* 407 Mich 424; 286 NW2d 416 (1979).

[4] *DeKind v Gale Manufacturing Co,* 125 Mich App 598; 337 NW2d 252 (1983).

from defendant's interpretation. The provision indicates that the Legislature knew it could limit imposition of sanctions to violations occurring after a notice of determination has been served. If it intended to limit imposition of civil penalties to violations occurring after a written notice of determination has been served, it could have expressly stated so as it did for criminal penalties.

Defendant's assertion that its argument is supported by MCL 323.6(b); MSA 3.526(b), which sets forth the remedies available against a municipality which discharges raw sewage of human origin into the waters of the state, is also unpersuasive. That provision limits the DNR to the administrative procedures specified in MCL 323.7; MSA 3.527, if the discharge by the municipality is not the subject of a valid permit previously issued. These procedures include issuing a notice of determination, followed by a hearing and the issuance of a permit setting forth conditions to continuing the discharge. However, if the discharge by the municipality is already the subject of a valid permit, the municipality is subject to all the penalties prescribed in MCL 323.10; MSA 3.529(1).

The existence of this provision does not support defendant's argument for two reasons. First, the Legislature may have intentionally limited the imposition of civil penalties and the other remedies upon municipalities because of a concern for taxing the public coffers for inadvertent or unknowing discharges by the municipality. Second, the fact that the Legislature limited the imposition of penalties upon municipalities to violations occurring after a valid permit has been issued indicates that the Legislature knew it could also limit the imposition of civil penalties upon private entities to violations occuring after the DNR has notified the private polluter that it is violating the

act. If the Legislature intended to so limit the imposition of civil penalties, it would have expressly done so.

Because the statutory provision in question clearly and unambiguously does not limit the imposition of civil penalties to violations of the act occurring after the DNR has issued a notice of determination, defendant's argument that the provision should be construed to the contrary should be rejected. We affirm the trial court's award of civil penalties.

Second, defendant claims that the trial court erred in requiring defendant to hook up both the Weslock residence and the Weiss Trucking Company to the local public water supply system.

Defendant contests the fact neither that it caused the contamination of the groundwater near its plant, nor that it contaminated the wells serving the Weslock residence and the Weiss Trucking Company. Defendant installed new wells on both those properties. According to Weslock, the owner of the residential property whose well was contaminated, the Kalamazoo County Health Department approved use of the new well, but only after a considerable amount of hesitation. Even though defendant installed the new wells for the affected properties, the trial court ordered it to hook up the properties to the water supply system of the Village of Schoolcraft. Apparently, this remedy was ordered on the basis of the trial judge's finding that chromium had been detected in the new deep well installed for the Weslock residence and that there was no clay barrier which would prevent the contaminants from moving downward into the aquifer.

The depth of the plume is approximately 60 feet. The Weslock's old well was at approximately 24 feet, which is the reason it became contaminated

by the plume. However, the new well drilled on the Weslock property extended to a depth of 170 feet. Defendant contends that there is no immediate danger to the new wells drilled for the Weiss Trucking Company and Weslock properties and that, because of this, the trial judge abused his discretion in requiring defendant to hook up the properties to the local public water supply system.

The WRA does not contain a complete list of specific remedies that a trial court may order to cure harm caused by a party violating it. MCL 323.10(1); MSA 3.529(1)(1) merely provides that the Attorney General may commence a civil action at the request of the DNR for "appropriate relief, including a permanent or temporary injunction, for violation of this act or rules promulgated hereunder". MCL 323.6(c); MSA 3.526(c) provides that a violation of MCL 323.6; MSA 3.526 is "prima facie evidence of the existence of a public nuisance and in addition to the remedies provided for in [the] act may be abated according to law". Thus, it may be argued that in fashioning a remedy for a violation of the act, the law regarding public nuisances may be applied.

The judgment entered by the trial court containing mandatory and prohibitive injunctive relief to abate the public nuisance is equitable in nature. In equity cases, this Court reviews the trial court's decision *de novo.* However, we attach great weight to the findings of the trial court and sustain those findings unless convinced that had we heard the evidence in the first instance we would have been compelled to make findings contrary to those actually made.[5] In other words, we set aside the trial

---

[5] *Marconeri v Village of Mancelona,* 124 Mich App 286; 335 NW2d 21 (1983); *Cascade Twp v Cascade Resource Recovery, Inc,* 118 Mich App 580; 325 NW2d 500 (1982); *Groveland Twp v Jennings,* 106 Mich App 504; 308 NW2d 259 (1981).

court's findings only where they are clearly erroneous. If the trial court's findings of fact are not clearly erroneous, then we review the record *de novo* to determine whether the equitable relief granted was appropriate in light of those facts.

In the within case, the trial judge found that there was no clay barrier to prevent the contaminants in the upper part of the aquifer from migrating downward in the aquifer. He further found that chromium was already detected in the new well installed for the Weslock residence and additionally found that the Weslock property should be connected to the village water system in view of his conclusion that the contamination of the deep well was likely to reach or exceed drinking water standards in the near future. The trial judge also found, after hearing testimony from plaintiffs' real estate experts, that the property values near the facility have been, or may be in the future, adversely affected unless the contamination of the groundwater is remedied.

The crucial dispute is over the trial court's finding that the contamination in the new well on the Weslock property is likely to reach or exceed acceptable drinking water standards. Defendant offered the expert testimony of a geology professor regarding the expected flow of the contaminated groundwater in the aquifer. The expert testified that because of the nature of the aquifer, he did not expect the plume to move downward to any great extent. He also testified that the aquifer was quite permeable and admitted that chromium and arsenic had been detected in the new Weslock well. Plaintiff offered the expert testimony of a hydrogeologist employed by the DNR who, testifying regarding the movement of the contaminated groundwater in the aquifer, said that there was a

possibility the contaminants could be pushed deeper in the aquifer.

The contrasting evidence appears to indicate that there is still a possibility that the new Weslock well will become contaminated. In light of the uncertainty as to exactly how deep into the aquifer the plume may travel and the evidence that the new well already contains contaminants, we decline to find that the trial judge's finding that contamination of the new well is likely is clearly erroneous.

Against this background of a finding that contamination of the new well is likely, together with the fact that the Weslocks may have consumed contaminated water for an uncertain period of time as a result of defendant's discharge of the Wolman solution into the groundwater for over nine years, we consider whether or not the trial court erred in ordering defendant to hook up both the Weslock residence and the Weiss Trucking Company to the local public water supply system.

In fashioning ways to abate a nuisance, the remedy should be tailored to meet the problem.[6] In the within case, the trial judge attempted to attain that objective. By ordering defendant to hook up both the Weslock and Weiss Trucking Company properties to the local public water supply system, he freed them from the continuing risk that their water supply would become contaminated. Under the circumstances, we do not believe the trial court erred in fashioning a remedy.

Third, defendant claims that the trial court erred in awarding damages to plaintiffs for costs incurred in investigating the pollution problem, saying that the award was based upon inadmissible hearsay evidence.

---

[6] *Norton Shores v Carr,* 81 Mich App 715; 265 NW2d 802 (1978).

At trial, plaintiffs presented evidence to support recovery of costs incurred in investigating and litigating the present controversy involving defendant's contamination of groundwater. Defendant concedes that under MCL 323.10; MSA 3.529(1) plaintiffs may recover such costs, but contend that the evidence upon which the trial judge based his finding as to costs was inadmissible hearsay.

Plaintiffs offered the testimony of a DNR supervisor to prove the costs they allegedly incurred. Plaintiffs' Exhibit 81 was a document listing the different costs allegedly incurred and was admitted into evidence by the trial judge. In a written opinion, the trial judge rejected plaintiffs' request for a total of $45,531.28 as costs, but awarded plaintiffs $26,923.78, ruling specifically as to whether or not each cost submitted to the supervisor by the different divisions of the DNR was denied or allowed. He denied some of the items of cost because they were not sufficiently documented.

Exhibit 81 included memoranda from each division specifying the costs the division incurred in connection with the problem at defendant's Schoolcraft facility. The memoranda had been submitted by division chiefs at the supervisor's request. Defendant objected to the admission of Exhibit 81 and to the competency of the supervisor to testify to the costs allegedly incurred by plaintiffs because defendant said that the supervisor did not have personal knowledge of the costs incurred by each division. In addition, defendant argued that plaintiffs' Exhibit 81 was hearsay and did not fall within any exception to the hearsay rule. Plaintiffs argued that the exhibit could be admitted under the public records exception to the hearsay rule, MRE 803(8). As indicated, the trial judge ultimately admitted the exhibit.

We are satisfied that the first page of plaintiffs' Exhibit 81, which is the summary of the total costs incurred, and the attached memoranda from other employees of the DNR listing costs incurred by each division of the DNR, is hearsay. The only question is whether or not the document should have been admitted under one of the exceptions to the hearsay rule.

Plaintiffs rely primarily upon MRE 803(8), which excepts from operation of the hearsay rule certain public records and reports and states as follows:

"(8) *Public records and reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, and subject to the limitations of MCLA 257.624; MSA 9.2324."

Plaintiffs' Exhibit 81 containing the memoranda from the employees of the divisions of the DNR setting forth the costs incurred was not admissible under MRE 803(8)(A) as a record or data compilation setting forth the activities of the divisions. This sub-rule should be construed to pertain to reports and data compilations regarding overall activities of a public office or agency. This sub-rule should be limited to reports and data compilations such as annual reports of the activities of the office or agency. It should not be used to permit the admission of a document asserting that a specific activity was undertaken. In the within case, therefore, the sub-rule should not apply to permit the admission of Exhibit 81, which includes memoranda asserting that divisions of the DNR incurred certain costs in investigating and litigating the

present action. Only those records or reports admissible under MRE 803(8)(B) should be admitted to prove a specific activity or action was undertaken.

Exhibit 81, including the attached memoranda from the different divisions of the DNR, should not have been admitted under MRE 803(8)(B). No law imposed the duty upon the employees of the divisions writing the memoranda to observe and report exactly what costs were incurred in performing services to investigate the present groundwater pollution problem. The memoranda sent to the supervisor were not prepared to carry out their duties as public employees. Instead, they were prepared for the purposes of this litigation. The inherent trustworthiness of documents prepared by a public official in carrying out his duties which justifies the public records exception does not apply to this case. The memoranda were prepared expressly for the purpose of proving the costs incurred by the divisions in order to recover those costs in this litigation.

Plaintiffs also argue that Exhibit 81 was admissible as a record of a regularly conducted activity pursuant to MRE 803(6). However, as a general rule, documents prepared for use in litigation are not admissible as records of regularly conducted activities.[7] The justification for the business records exception is that a record kept in the regular course of business is trustworthy. However, where the record is prepared for the purpose of litigation, the record does not have the inherent trustworthiness that a record kept in the regular course of business does.

In the present case, the memoranda which were prepared for the express purpose of being used in

---

[7] *People v Cortez,* 131 Mich App 316; 346 NW2d 540 (1984).

this action to prove plaintiffs' costs did not have the inherent trustworthiness of a record made in the regular course of business. Thus, plaintiffs' Exhibit 81 should not have been admitted. It was hearsay and could not be admitted under this exception to the hearsay rule. The trial judge erred in admitting plaintiffs' Exhibit 81 as evidence to prove the costs incurred by plaintiffs in investigating the groundwater pollution problem created by defendant. Furthermore, the testimony of the supervisor does not appear to have been competent evidence of the costs incurred. He had no knowledge of the costs incurred by each division other than the memoranda he received from employees of the divisions. Thus, in these circumstances, his testimony was also incompetent to prove the costs incurred by plaintiffs.

Because there was no competent evidence to prove the costs incurred by plaintiffs, we set aside the trial judge's award of $26,923.78 for these costs and remand the case to the trial court to give plaintiffs an opportunity to show by admissible, competent and relevant evidence the costs properly chargeable to defendant consistent with this opinion.

Affirmed in part, reversed in part and remanded. We do not retain jurisdiction.