## SOLOMON v SHUELL

Docket No. 82658. Argued January 9, 1990 (Calendar No. 1). Decided
    July 3, 1990.

Charlotte Solomon, as personal representative of the estate of
    Joseph Solomon, deceased, brought an action for wrongful·
    death in the Wayne Circuit Court against the Detroit Police
    Department and Officers John Shuell, Michael Hall, and Rich-
    ard Nixon, alleging negligence, assault and battery, and the
    violation of the decedent's constitutional rights following his
    fatal shooting by Officer Shuell while the officers were investi-
    gating a series of armed robberies. Officer Nixon was dismissed
    before the case went to the jury. The court, Marvin R. Stem-
    pien, J., directed a verdict in favor of Officer Hall and the
    police department and entered judgment on a special jury
    verdict for the plaintiff, which found that Shuell was negligent,
    that his negligence was a proximate cause of Solomon's death,
    and that the decedent also was eighty percent negligent. The
    Court of Appeals, HOOD and T. M. BURNS, JJ. (SHEPHERD, P.J.,
    dissenting), affirmed, finding that the trial court had properly
    admitted four police reports into evidence under MRE 803(6) as
    business records and that, although the jury had been in-
    structed improperly regarding the rescue doctrine, the error
    was harmless (Docket No. 90688). The plaintiff appeals.

In an opinion by Justice ARCHER, joined by Justices LEVIN
    and CAVANAGH, and an opinion by Justice BOYLE, joined by
    Chief Justice RILEY and Justice BRICKLEY, the Supreme Court
    *held:*

The police reports were improperly admitted into evidence
    under MRE 803(6) as business records because each exhibit
    lacked the trustworthiness that the rule requires as a condition
    of admissibility, and each was not otherwise admissible as a
    public record. The jury was instructed erroneously with respect
    to the rescue doctrine. Because the instructions did not ade-
    quately present the plaintiff's theory of the case to the jury

REFERENCES
Am Jur 2d, Evidence §§ 927, 928, 937-940; Negligence §§ 1093, 1215.
See the Index to Annotations under Business Records; Comparative
    Negligence; Rescue.

and because the jury could not otherwise undertake a proper negligence analysis, the error cannot be deemed harmless, requiring reversal and remand for a new trial.

1. MRE 803(6), the business records exception to the hearsay rule, provides that reports or records kept in the course of a regularly conducted business activity are not to be excluded as hearsay unless the source of information or method or circumstances of preparation indicate a lack of trustworthiness. Presumed trustworthiness of both the source of information reported and the accuracy with which the information is recorded was the traditional basis of the exception. Under MRE 803(6) and FRE 803(6), trustworthiness is an express threshold condition of admissibility and is presumed, subject to rebuttal, when the party offering the evidence establishes the requisite foundation. Although proffered evidence may meet the literal requirements of the rules, trustworthiness is rebutted where, upon a party's timely objection, the trial court determines that the source of information or the method or circumstances of preparation lack trustworthiness. Under the circumstances of this case, the four exhibits lacked trustworthiness within the meaning of MRE 803(6). The exhibits also are inadmissible under MRE 803(8)(B), which excepts records of matters observed and reported pursuant to a duty.

2. A person who is injured in a reasonable attempt to rescue another person who was placed in danger by a third party is not deemed comparatively negligent merely because of voluntary exposure to increased risk of harm and may recover for injuries suffered as a result of the attempt. Although the rescue doctrine applies even if the victim never was in actual danger, the dispositive issue in determining whether the rescue attempt itself is reasonable is whether the rescuer acted as a reasonable person would under the same or similar circumstances. In this case, because the trial court instructed the jury that the victim had to be in actual danger at the time of the rescue attempt, the instruction was erroneous and misleading. In addition, it did not clearly charge the jury to undertake its inquiry from the viewpoint of a reasonable person acting under the same or similar circumstances as the decedent. Because the plaintiff's theory of the case was not adequately presented to the jury, the plaintiff suffered prejudice inconsistent with substantial justice, requiring reversal.

Justice ARCHER, joined by Justices LEVIN and CAVANAGH, stated further that although the exhibits meet the literal requirements of MRE 803(8)(B), the public records hearsay exception, they are nevertheless inadmissible because of the

circumstances under which they were prepared and because they are replete with multiple layers of hearsay within hearsay under MRE 805. As with the business records hearsay exception, inherent trustworthiness also lies at the heart of the public records hearsay exception. Trustworthiness generally is ensured because such records are prepared under circumstances providing an official duty to observe and report. However, under certain circumstances, such as where records are prepared in anticipation of litigation or where the preparer or the supplier of information had a motivation to misrepresent, trustworthiness is no longer present even though a record may meet the literal requirements of the rule. In this case, the potential motivation to misrepresent is obvious. The witness statements were taken during the course of the police department's homicide investigation, which the officers knew could result in criminal prosecution and interdepartmental discipline. In addition, the officers were aware that it was highly probable that they and the city would face civil litigation and potential liability. Admission of the exhibits into evidence over the plaintiff's timely objection was clearly improper and constituted an abuse of discretion.

Justice BOYLE, joined by Chief Justice RILEY and Justice BRICKLEY, concurring, stated that while the police reports and statements were not admissible under MRE 803(6) or MRE 803(8)(B), they were not admissible under MRE 803(8)(B) because there are investigative reports which fall outside the scope of that rule. In any event, their improper admission was harmless error which did not prejudice the plaintiff. The hearsay statements merely were cumulative of properly admitted testimony, the hearsay declarants testified at trial and were subject to cross-examination regarding their prior statements, and some of the hearsay statements were favorable to the plaintiff with regard to the critical fact whether the officers identified themselves to the decedent as police officers.

An error which does not affect a party's substantial rights is not ground for reversal. The burden is on the appellant to show that the error was prejudicial and that failure to reverse would be inconsistent with substantial justice. Federal and state case law provides that improperly admitted hearsay evidence is harmless where merely cumulative of other properly admitted evidence. Mere potential for prejudice does not warrant reversal.

Because the trial court's instruction regarding the rescue doctrine together with its instructions regarding comparative negligence could have misled the jury to apply a standard other than reasonable conduct under the same or similar circum-

stances to the acts of the decedent, the case should be reversed and remanded for a new trial.

Reversed and remanded.

Justice GRIFFIN, dissenting, stated that, while the trial court's instruction regarding the rescue doctrine technically was flawed, the error does not warrant reversal. Reading the instructions as a whole, it appears that the theories of the parties and the applicable law were fairly presented to the jury and that, had a different instruction been given, the jury's verdict would not have been different.

166 Mich App 19; 420 NW2d 160 (1988) reversed.

1. EVIDENCE — HEARSAY — BUSINESS RECORDS — TRUSTWORTHINESS.

Reports or records kept in the course of a regularly conducted business activity are not to be excluded as hearsay unless the source of information or method or circumstances of preparation indicate a lack of trustworthiness; trustworthiness is an express threshold condition of admissibility, and is presumed, subject to rebuttal, when the party offering the evidence establishes the requisite foundation; although proffered evidence may meet the literal requirements of the rules, trustworthiness is rebutted where, upon a party's timely objection, the trial court determines that the source of information or the method or circumstances of preparation lack trustworthiness (MRE 803[6], FRE 803[6]).

2. NEGLIGENCE — RESCUE — COMPARATIVE NEGLIGENCE.

A person who is injured in a reasonable attempt to rescue another person who was placed in danger by a third party is not deemed comparatively negligent merely because of voluntary exposure to increased risk of harm, and may recover for injuries suffered as a result of the attempt.

*Thurswell, Chayet & Weiner* (by *Harvey Chayet, Julie Griffiths,* and *Tammy J. Reiss*) for the plaintiff.

City of Detroit Law Department (by *Marion R. Jenkins*), Assistant Corporation Counsel, for the defendant.

Amici Curiae:

*Williams, Schaefer, Ruby & Williams, P.C.* (by

*James P. Cunningham),* for Family Law Section of the State Bar of Michigan.

*Dykema, Gossett* (by *Robert N. Hammond)* and *Cheatham & Acker* (by *James G. Gross)* for Michigan Defense Trial Counsel.

*Mark Granzotto, Monica Linkner,* and *Charles P. Burbach* for Michigan Trial Lawyers Association.

ARCHER, J. We granted leave to appeal in order to consider two principal questions. The first question is whether four police reports were properly admitted into evidence under either MRE 803(6), the business records exception to the hearsay rule, or MRE 803(8), the public records hearsay exception. The second question is whether the jury was properly instructed on the so-called rescue doctrine. We would hold that the police reports were improperly admitted into evidence and that the jury was improperly instructed on the rescue doctrine. We therefore would reverse the judgment of the Court of Appeals and remand the case for a new trial.

I

Plaintiff-appellant Charlotte Solomon, personal representative of the estate of Joseph Solomon, filed this wrongful death action against the City of Detroit and Detroit Police Officers John Shuell, Michael Hall, and Richard Nixon after Officer Shuell shot and killed her husband on March 20, 1981.

Officers Shuell and Nixon were members of the department's Western Surveillance Unit. Sergeant Hall was their supervisor. The three officers were

plain clothed and drove separate unmarked automobiles.

On March 19 and 20, 1981, the officers were investigating a series of armed robberies on Detroit's west side. Prior to March 19, four armed men had stolen two cars from two separate automobile dealership salesmen while on test drives. Both robberies were at gunpoint. After reporting the robberies, both salesmen told the police that the perpetrators had driven to their dealerships in a Ford Thunderbird, license plate number SYF-830. The Thunderbird was registered to Claudia Williams, and the police began an undercover surveillance of her home at 18603 Curtis Street in Detroit.

On March 20, at 2:30 P.M., Officers Shuell and Nixon were assigned to the surveillance of Curtis Street in plain clothes and in separate unmarked vehicles. Alvin Solomon, Joseph Solomon's son, and a male passenger arrived in an Oldsmobile at the Curtis Street house and picked up two more men. After informing Sergeant Hall, who was also on duty in his own unmarked car, the officers were ordered to follow the Oldsmobile. They followed it to 20045 Ward, where two of the men got out of the vehicle. The car drove on, and the officers continued to follow the vehicle but lost it in traffic.

Sergeant Hall ordered the officers to return to Ward Street and watch the house. Later that afternoon, the two suspects, who had previously entered 20045 Ward, left the residence. Sergeant Hall and Officers Nixon and Shuell then stopped and questioned the suspects as they walked down the block away from the house.

At approximately the same time as the two suspects were being questioned, another police officer radioed Shuell and Nixon and told them that the Ford Thunderbird used in the armed

robberies had returned to the Curtis Street address. Sergeant Hall ordered Shuell and Nixon to return to Curtis Street. Along the way, Nixon spotted the Oldsmobile driven by Alvin Solomon. Alvin, now accompanied by his girl friend, Wynee Green, was driving north on Strathmoor Street. Nixon relayed the information to Shuell and Sergeant Hall and followed the Oldsmobile to 20045 Strathmoor, the Solomon family home. Nixon pulled up behind the Oldsmobile. Shortly thereafter, Shuell stopped in front of the suspect's automobile. The two officers got out and approached the Oldsmobile. The account of what happened next differs according to the trial testimony.

Alvin testified that, after he got out of his car, Nixon rushed him, quickly flashed a badge, threw him toward the car, and confiscated a pellet gun that he carried in his waistband. Shuell ran toward the two, failed to identify himself as a police officer, put his gun to Alvin's head and dragged him to the rear of the car. Alvin told Wynee to get his father, Joseph Solomon, who came outside with a gun, which was pointed down toward the ground. Neither Nixon nor Shuell identified themselves to Alvin's father. Before Joseph Solomon could come off the front porch, Shuell fired his gun, striking him. Joseph Solomon kept approaching Shuell and Alvin and fell dead at the end of the driveway.

Charlotte Solomon, Alvin's mother and Joseph's wife, testified that, at the time of the incident, she and her husband were inside their home watching television. Joseph got up, briefly left the room and came back in and said, "[s]omebody got my child out there." He went outside with his gun and yelled, "[t]urn my child loose." Charlotte got to the doorway in time to see her husband fall at the end of the driveway.

Nixon testified that, as he approached the Oldsmobile, he showed Alvin his badge and ID card and told him he was a police officer. As Alvin got out of the vehicle, Nixon saw a gun in Alvin's waistband, which he confiscated. At this time, Shuell asked Alvin to put his hands on the car so he could be frisked. Alvin resisted, shouting at his girl friend to get his father. As Nixon walked around the car to restrain the girl, he heard a noise at the doorway of the house. Joseph Solomon ran out of the house and came off the porch holding a gun in both hands, extended in a combat stance. Nixon held his badge up and yelled, "Sir, we're police officers, we're police officers." Nixon heard one shot, turned, and saw Joseph Solomon's hands recoil. He then heard other shots, after which Joseph fell. Nixon also stated that neither Shuell nor he had drawn their guns before Joseph Solomon came out of the house.

Shuell testified that both Nixon and he approached the car, showed Alvin their badges, and told him they were police officers. As Alvin got out of his car, Shuell told Nixon he saw a gun in Alvin's waistband and grabbed Alvin by his left wrist. Shuell told Alvin he was under arrest, and asked him to place his hands on the car. Alvin backed away from the car and told his girl friend to get his father. Shuell told Alvin to go to the rear of the car and put his hands on the trunk. Shuell was frisking Alvin when Nixon yelled, "Police, police, John, look out, he's got a gun." Joseph Solomon assumed a two-hand stance and aimed his gun at Shuell. As Shuell grabbed Alvin, Joseph told Alvin to get down. Alvin shouted, "Daddy, don't do it." Shuell yelled, "Drop the gun. Police." As Shuell fell to the ground with Alvin, his pistol was still in its holster. Joseph fired one shot, which missed Shuell. By this time, Shuell had

drawn his weapon and returned Joseph Solomon's fire.

Joseph Solomon fired at least one shot. Shuell fired nine, eight of which hit Solomon, instantly killing him.

Plaintiff-appellant filed the present case in Wayne Circuit Court. She alleged negligence, assault and battery, and the violation of her husband's constitutional rights. Before the case went to the jury, defendant Nixon had been dismissed. In addition, the trial judge granted a directed verdict in favor of defendants Michael Hall and the City of Detroit.

As to defendant Shuell, the jury returned a special verdict, finding that Shuell was negligent and that his negligence was a proximate cause of Joseph Solomon's death. Consequently, the jury found plaintiff's damages to be $100,000. The jury also found, however, that decedent was negligent and that his own negligence was also a proximate cause of his death and assessed this at eighty percent. Accordingly, a judgment was entered in favor of plaintiff for $20,000.[1]

Plaintiff subsequently filed a claim of appeal, alleging that the trial court had improperly admitted four exhibits into evidence and had improperly instructed the jury. The Court of Appeals panel, one judge dissenting, rejected plaintiff's argument that the trial court improperly admitted into evidence four police reports under MRE 803(6), the business records hearsay exception. Although two members of the panel agreed with plaintiff that the trial court also committed error by giving a modified version of SJI2d 13.07, stating the so-called rescue doctrine, the Court found this error

---

[1] The jury also found that Shuell did not commit assault and battery. In addition, the jury did not answer whether decedent's constitutional rights had been violated.

to be harmless.[2] The Court of Appeals, therefore, affirmed the decision of the trial court. 166 Mich App 19; 420 NW2d 160 (1988).

Plaintiff-appellant subsequently applied for leave to appeal in this Court, which we granted on April 11, 1989, limited to the issues (1) whether the trial court improperly admitted into evidence four police reports prepared during the investigation of decedent's shooting, and (2) whether the trial court properly instructed the jury on the so-called rescue doctrine. 432 Mich 891 (1989). Subsequently, we ordered the parties to submit supplemental briefs on the applicability of MRE 803(8), the public records hearsay exception, to the four police reports. We also invited amicus curiae briefs to be filed. The order was entered on October 24, 1989.

II

The first question presented is whether four police reports were improperly admitted into evidence. Plaintiff's exhibit 113 and defendant's exhibit 122 are police department homicide witness statements taken during the investigation of decedent's death. Both witness statements are in question and answer form. Plaintiff's exhibit 113 contains Nixon's version of the decedent's shooting, and defendant's exhibit 122 contains Shuell's.

Plaintiff's exhibit 34A and defendant's exhibit 121 are preliminary complaint reports, the initial report an officer writes detailing his actions during a particular assignment. A preliminary complaint report is the starting point for the subsequent interdepartmental investigation of an incident. Plaintiff's exhibit 34A is a supplementary report Sergeant Hall wrote describing in detail his con-

---

[2] The dissenting judge did not address the jury instruction issue.

versation with Officer Shuell immediately following decedent's shooting. Defendant's exhibit 121 is Officer Shuell's report describing his actions during the events leading up to decedent's death.

At various points during the trial, the defense moved to admit each exhibit. The trial court admitted each exhibit over plaintiff's timely objection, and the Court of Appeals affirmed.

Before this Court, the parties concede that the four exhibits are defined as hearsay, MRE 801(c).[3] The exhibits are, therefore, inadmissible under MRE 802,[4] unless subject to an MRE 803 exception.[5] Consequently, we must determine whether the Court of Appeals correctly held that the four reports were properly admitted into evidence and that the trial court did not abuse its discretion when it overruled plaintiff's timely objection. *Hadley v Trio Tool Co,* 143 Mich App 319, 328; 372 NW2d 537 (1985). See *People v Golochowicz,* 413 Mich 298, 322; 319 NW2d 518 (1982).

A

Plaintiff-appellant first argues that the four exhibits are inadmissible under the business records exception to the hearsay rule. MRE 803(6) provides:

The following are not excluded by the hearsay

---

[3]　(c) Hearsay. "Hearsay" is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. [MRE 801(c).]

[4]　Hearsay is not admissible except as provided by these rules. [MRE 802.]

[5] Neither party argues that the exhibits are admissible under MRE 804.

rule, even though the declarant is available as a witness:

\* \* \*

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, or events, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.[6]

The defense offered the four exhibits over plaintiff's timely objection. Before the trial court, plaintiff argued that, even if the reports were "records" within the meaning of MRE 803(6), the source of information and the circumstances of preparation lacked trustworthiness. Plaintiff reasoned that the reports and homicide witness statements were untrustworthy because when the documents were prepared, the police officers knew they were the subject of a homicide investigation that could result in criminal prosecution, civil liability, and interdepartmental discipline. In addition, the four documents were prepared following a waiver of *Miranda*[7] rights and in the presence of counsel.[8]

---

[6] MRE 803(6) is identical to FRE 803(6) except that MRE 803(6) is limited to "acts, transactions, occurrences, or events," while FRE 803(6) applies to "acts, events, conditions, opinions, or diagnoses . . . ."

[7] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[8] The record reveals that, during oral argument outside the pres-

Although the trial court noted the circumstances under which the reports were prepared, it nevertheless rejected plaintiff's argument that the exhibits lacked trustworthiness. As to the motivation to misrepresent, the court acknowledged that the officers could have made their statements in a light most favorable to protect their relationships and avoid interdepartmental sanctions and potential criminal and civil liability. In addition, the court also held, in effect, that the issue of trustworthiness under MRE 803(6) went to the credibility and weight the jury should assign each exhibit and not to admissibility. Because plaintiff could not point to specific facts on the face of each exhibit indicating a lack of trustworthiness, the court overruled plaintiff's objection and admitted each exhibit into evidence.

On appeal, two Court of Appeals panel members affirmed. Judge SHEPHERD, in dissent, however, would have found that the trial court's ruling amounted to prejudicial error requiring reversal because "the motivation to misrepresent is obvious." 166 Mich App 31. The narrow issue presented under the hearsay business records exception, consequently, is whether the trial court improperly held that the four reports satisfied the trustworthiness requirement of MRE 803(6).[9]

It is beyond dispute that the presumed trustworthiness of both the source of information reported and the accuracy with which the information is recorded lies at the heart of the business

ence of the jury, plaintiff's counsel informed the court that the officers were advised of their constitutional rights and provided counsel.

[9] Plaintiff-appellant concedes before this Court that the four exhibits were "kept in the course of a regularly conducted business activity" and that it was the department's regular practice to compile such reports. Therefore, we assume, without deciding, that these two elements of MRE 803(6) have been established.

records hearsay exception as it was conceived by the common law, promulgated in model, uniform, and state statutes, and, finally, adopted and enacted in the current Rules of Evidence. We unanimously concluded in *Central Fabricators v Big Dutchman,* 398 Mich 352; 247 NW2d 804 (1976), that an interoffice memorandum of a purported telephone conversation was inadmissible under MCL 600.2146; MSA 27A.2146,[10] the statutory precursor of MRE 803(6). In *Central Fabricators,* we noted that trustworthiness is furnished not merely from the high degree of reliance placed upon business records, but also from the circumstances under which traditional business records are prepared:

The exception to the hearsay rule for records made in the regular course of business

"is justified on grounds analogous to those underlying other exceptions to the hearsay rule. Unusual reliability is regarded as furnished by the fact that in practice regular entries have a comparatively high degree of accuracy (as compared to other memoranda) because such books and records are customarily checked as to correctness by systematic balance-striking, because the very regular-

---

[10] Any writing or record whether in the form of an entry in a book or otherwise, made as a memorandum of any act, transaction, occurrence or event shall be admissible in evidence in all trials, hearings and proceedings in any cause or suit in any court, or before any officer, arbitrators, or referees, in proof of said act, transaction, occurrence or event if it was made in the regular course of any business and it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record including lack of personal knowledge by the entrant or maker, may be shown to affect its weight but not its admissibility. The term "business" shall include business, profession, occupation and calling of every kind. [MCL 600.2146; MSA 27A.2146.]

ity and continuity of the records is calculated to train the record-keeper in habits of precision, and because in actual experience the entire business of the nation and many other activities constantly function in reliance upon entries of this kind." McCormick's Handbook of the Law of Evidence (2d ed), § 306, p 720. [*Central Fabricators, supra,* pp 356-357.]

The current business records hearsay exception codified in MRE 803(6) and its federal counterpart, FRE 803(6), derives from two separate and distinct common-law exceptions to the hearsay rule, the shop book rule and the regular entries rule. 5 Wigmore, Evidence (Chadbourn rev), § 1518, pp 426-430; McCormick, Evidence (3d ed), § 305, p 871. The rules were limited in scope and imposed stringent foundation requirements on the parties offering evidence.[11] Notwithstanding the common law's limitations that in the modern commercial context would seem unduly burdensome and have been appropriately rejected by the modern rules, the justifications for these two common-law hearsay exceptions were soundly rooted in the rationale for excluding hearsay evidence in the first place[12] and

---

[11] In addition to requiring that the entries be regularly made at or about the time of the transaction and as a part of the routine of the business, other common restrictions were that (1) the party using the book not have had a clerk, (2) the party file a "supplemental oath" to the justness of the account, (3) the books bear an honest appearance, (4) each transaction not exceed a certain limited value, (5) witnesses testify from their experience in dealing with the party that the books are honest, (6) the books be used only to prove open accounts for goods and services furnished the defendant (thus making them unavailable for proof of loans, and goods and services furnished under special contract or furnished to third persons on defendant's credit), and (7) other proof be made of the actual delivery of some of the goods. [McCormick, *supra,* § 305, p 871. See also Laughlin, *Business entries and the like,* 46 Iowa L R 276, 282-283 (1961).]

[12] See Wigmore, *supra,* § 1420, p 251. "The purpose and reason of the hearsay rule is the key to the exceptions to it."

continue to be so to this very day.

Ideally, a witness' testimony is evaluated while the witness is under oath, subject to cross-examination, and personally present before the trier of fact. *People v Kirtdoll,* 391 Mich 370, 386, n 8; 217 NW2d 37 (1974); FRE Advisory Committee Note, 56 FRD 183, 288 (1972). See also *Colgrove v Goodyear,* 325 Mich 127, 134; 37 NW2d 779 (1949). While the definition of hearsay, both at common-law and under the current rules as well, would exclude much probative evidence where one or more of these ideal conditions is lacking, the common-law hearsay exceptions recognized that, when evaluated in light of two principles, hearsay evidence was in limited circumstances as sufficiently reliable as evidence given under ideal conditions. Wigmore, *supra,* §§ 1420-1423, pp 251-255. Under the principle of necessity, the admission of hearsay evidence was justified not merely to avoid the loss of a person's evidence because the witness may be unavailable to personally testify, but also to admit evidence, such as an excited utterance, that may derive from an inherently superior source. Wigmore, *supra,* § 1421, p 253. The second principle, the circumstantial probability of trustworthiness, arose from the fact that, under certain circumstances, the trustworthiness of the source of information and the accuracy of recording is sufficiently great to be the equivalent of a statement given under the ideal conditions of oath, cross-examination, and in the presence of the trier of fact. Wigmore, *supra,* § 1422, pp 253-254.

It is under the circumstantial probability-of-trustworthiness principle, and to a lesser extent the necessity principle, that the traditional common-law business records exception was premised. Specifically, the circumstantial probability of trustworthiness of traditional business records is suffi-

ciently great to justify an exception to the hearsay rule because of habit, the detection of errors, and an employer's reliance on the result. Wigmore, *supra,* § 1522, pp 442-443. Habit, or the regular and systematic preservation of information, by its very nature calls for accuracy. *Id.* Consequently, errors or unintentional misstatements are almost certain to be detected. *Id.* Furthermore, if the employee preparing the report is under a duty to do so or is aware of his employer's general reliance on the accuracy of the records, a powerful motivation to be accurate is supplied. *Id.*

It is clear that the traditional business records hearsay exception is justified on grounds of trustworthiness: unintentional mistakes made in the preparation of a record would very likely be detected and corrected. Where, however, the source of information or the person preparing the report has a motivation to misrepresent, trustworthiness can no longer be presumed, and the justification for the business records exception no longer holds true. Wigmore, *supra,* § 1522, pp 442-443, § 1527, p 448; McCormick, Evidence, § 308, pp 875-878. Thus, in *Central Fabricators, supra,* we found the leading case of *Palmer v Hoffman,* 318 US 109; 63 S Ct 477; 87 L Ed 645 (1943), persuasive authority supporting the proposition that the motivation to misrepresent is a strong indicator of a lack of trustworthiness. In *Palmer,* the United States Supreme Court held that a railroad accident report was not made " 'in the regular course' of the business," a requirement by its nature ensuring trustworthiness, as defined in the federal business records hearsay statute.[13] The Supreme Court reasoned that, although it may have been in the

---

[13] 28 USC 695 (currently codified as amended at 28 USC 1732). The federal business records statute is substantially identical to MCL 600.2146; MSA 27A.2146.

regular course of the railroad's systematic operations to record its employee's version of an accident, the admission of the report into evidence would make the act applicable to any recording system, "though it had little or nothing to do with the management or operation of the business as such." 318 US 113. Thus, the Court concluded that the report was not made "for the systematic conduct of the enterprise as a railroad business. . . . [The report's] primary utility is in litigating, not in railroading." 318 US 114.

Although in *Palmer* the Supreme Court analyzed the issue in terms of whether the report was made in the regular course of railroad business as defined in the federal act, the motivation for making the report in the first place lies at the very heart of the act's definition of "regular course of business," and, in this respect, the opinion of the United States Court of Appeals for the Second Circuit in *Palmer*[14] analyzed the report from a slightly different perspective while reaching the same result. The Second Circuit panel noted, as did the Supreme Court, that even though the railroad's employee was under a duty to his employer to make the report, the circumstances surrounding the preparation of the report, such as the anticipation of highly probable litigation, took the report outside the special legal meaning of "regular course of business":

> Each trade has its peculiar jargon and courts rely on that jargon when it finds its way into a statute dealing with that trade.
> And so with "regular course of business" as applied to records or memoranda in an evidence statute. To a layman, the words might seem to mean any record or paper prepared by an em-

---

[14] *Hoffman v Palmer,* 129 F2d 976 (CA 2, 1942).

ployee in accordance with a rule established in that business by his employer. But according to the jargon of lawyers and judges those words, in discussions of evidence, have always meant writings made in such a way as to afford *some* safeguards against the existence of any *exceptionally* strong bias or *powerful* motive to misrepresent. [129 F2d 976, 984 (CA 2, 1942). Emphasis in the original.]

Thus, the Second Circuit concluded that the document was inadmissible under the federal act not merely because it may have been prepared to "perpetuate evidence" in anticipation of litigation, 129 F2d 991, but rather because the looming specter of potential liability supplied a powerful motivation to misrepresent. Because the railroad and its employee were exposed to highly probable litigation and potential liability, any possible errors in the report could no longer be considered mere misstatements. Consequently, the report was "dripping with motivations to misrepresent." 129 F2d 991. Although the dissenting panel member noted that "there is hardly a grocer's account book which could not be excluded on that basis,"[15] 129 F2d 1002 (Clark, J., dissenting), *Palmer* has subsequently been read to stand for the proposition that the trial court, in its discretion, may exclude evidence meeting the literal requirements of the business records exception where the underlying circumstances indicate a lack of the trustworthiness business records are presumed to have. McCormick, *supra,* § 308, p 877.

As *Palmer* indicates, trustworthiness, under the current Rules of Evidence, no longer serves as a mere philosophical justification for the admission of evidence otherwise excluded as hearsay. Rather,

[15] See also Laughlin, n 11 *supra,* p 289 (*Palmer* "violates the letter" of the federal statute).

under MRE 803(6) and FRE 803(6), trustworthiness
is itself an express threshold condition of admissi-
bility. First, the rule on its face provides that
evidence otherwise meeting the literal require-
ments of MRE 803(6) and FRE 803(6) shall not be
admissible where "the source of information or the
method or circumstances of preparation indicate
*lack of trustworthiness.*" MRE 803(6), FRE 803(6)
(emphasis added).

In addition, the evolution of the business records
hearsay exception from its common-law origins to
the current Rules of Evidence further supports
this interpretation. Beginning in the 1920's, vari-
ous model and uniform acts were formulated to
ease the burdensome restrictions that had devel-
oped under the common-law business records ex-
ception. Many of the limitations, such as the nar-
row definition of "business," the requirements of
"originality," and the unavailability of all partici-
pants involved in the preparation of a record, no
longer served to ensure the practical trustworth-
iness of the proffered evidence. McCormick, *supra,*
§§ 305-306, pp 871-872; Wigmore, *supra,* § 1561a,
pp 489-490. The 1927 Commonwealth Fund Act,[16]
which served as the model for the federal and
Michigan statutory forerunners of the current
Rules of Evidence, eliminated these restrictions
which no longer comported with modern commer-
cial practices. At the same time, the Common-
wealth Fund Act ensured the trustworthiness busi-
ness records were presumed to have by requiring
that a "writing or record" was prepared "in the
regular course of any business" and that "it was

[16] The Commonwealth Fund Act was essentially identical to 28 USC
695 (currently codified as amended at 28 USC 1732) and MCL
600.2146; MSA 27A.2146. See Morgan, *The Law of Evidence, Some
Proposals for Its Reform* (New Haven: Yale University Press, 1927), p
63.

the regular course of such business" to prepare the "writing or record."

The 1936 Uniform Business Records As Evidence Act[17] further broadened and simplified the traditional business records exception. At the same time, however, the act expressly introduced the element of judicial discretion, directing the trial court to determine, as a matter of admissibility, whether "the sources of information, method, and time of preparation were such as to justify [a record's] admission."

Uniform Rule of Evidence 63(13)[18] also expressly referred to "the judge," and it provided for the trial court to determine not merely whether the "writing[ ]" was "made in the regular course of a business," but also whether "the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness." Because the uniform rule eliminated the requirement that the memorandum be prepared by a person with knowledge of the facts recorded, the rule's policy was to

---

[17] § 1. Definition.—The term "business" shall include every kind of business, profession, occupation, calling or operation of institutions, whether carried on for profit or not.

§ 2. Business Records.—A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission. [9A ULA 506 (1965).]

[18] (13) Business Entries and the Like. Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the judge finds that they were made in the regular course of a business at or about the time of the act, condition or event recorded, and that the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness. [9A ULA 637 (1965).]

expressly require the trial court to ensure that the proffered evidence had the trustworthiness business records traditionally were presumed to have.[19] It is the uniform rule's language of the trustworthiness element that most closely parallels that of the rule adopted by the United States Supreme Court,[20] which Congress ultimately enacted as FRE 803(6).

The evolution of the business records hearsay exception clearly indicates that FRE 803(6) and MRE 803(6) have eliminated burdensome common-law restrictions and have broadened the scope of the exception. In order to ensure the same high degree of accuracy and reliability upon which the traditional, but narrowly construed business records exception was founded, the current rules also recognize that trustworthiness is the principal justification giving rise to the exception. Thus, FRE 803(6) and MRE 803(6) provide that trustworthiness is presumed, subject to rebuttal, when the party offering the evidence establishes the

[19] Instead of prescribing as does Model Code Rule 514 that the memorandum must be made by the person having knowledge of the act, event or condition or must be transmitted by such person in the course of the business for inclusion in the memorandum, the broader policy of the Uniform Act is adopted leaving it up to the judge to determine whether or not the sources of information, method and time of preparation reflect trustworthiness. [Uniform Rules of Evidence, comment to ¶ 13, 9A ULA 646 (1965).]

[20] The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \*

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness, unless the sources of information or other circumstances indicate lack of trustworthiness. [56 FRD 183, 300-301 (1972).]

requisite foundation. Even though proffered evidence may meet the literal requirements of the rule, however, the presumption of trustworthiness is rebutted where "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Consequently, in cases like the present, the trial court, upon a party's timely objection, must determine as a question of admissibility whether the proffered evidence lacks trustworthiness. Upon the basis of our review of this record, we conclude that the trial court improperly held that the proffered exhibits did not lack trustworthiness. We would hold, therefore, that, under the facts of this case, the four exhibits lacked trustworthiness within the meaning of MRE 803(6) and were improperly admitted into evidence.

The trial court improperly concluded that the sources of information and the circumstances under which the four police reports were prepared did not lack trustworthiness as that term is narrowly defined in MRE 803(6). As to the officer's motivation to misrepresent, we agree with dissenting Judge Shepherd, that, in this case, the motivation to misrepresent is obvious and indicates a lack of trustworthiness. Officers Nixon and Shuell's witness statements were taken during the course of the department's homicide investigation, which they knew could result in a criminal prosecution. They, along with Sergeant Hall, would also be subject to the department's internal affairs investigation, which could result in interdepartmental discipline. Finally, it was highly probable that the officers and the city faced civil litigation and potential liability. Although the trial court rejected this potential motivation to misrepresent as too speculative, it did recognize that even Officer Nixon, who did not fire a single shot at dece-

dent, possibly was "anything but totally frank with the homicide investigators."

Rather than reject as speculative plaintiff's argument that the officers had a motivation to misrepresent, we believe that, when the exhibits are viewed under the circumstances of their preparation, the motivation to misrepresent becomes clearer. Although the trial court noted that there is no evidence suggesting an improper motivation to misrepresent on the part of departmental homicide investigators and that proper departmental procedures were followed, it is these very same procedures that indicate a lack of trustworthiness as that term is defined under MRE 803(6). The homicide witness statements, for example, were taken following a waiver of *Miranda* rights, which could only heighten the officers' awareness that anything said could and would be used against them in a court of law.[21] In addition, the witness statements and the preliminary complaint reports were taken and prepared with the assistance of counsel, who would, at the very least, advise the officers not to make any inculpatory statements. The homicide statements were taken on March 25 and 26, five and six days following decedent's shooting, which permitted time for reflection and deliberation not contemplated within the meaning of MRE 803(6). We conclude, therefore, that the homicide investigation reports, as well as the pre-

---

[21] The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest. [*Miranda v Arizona*, n 7 *supra*, p 469.]

liminary complaint reports, lacked trustworthiness
and, when made under these circumstances and in
light of the highly probable civil and criminal
litigation and departmental discipline the officers
potentially faced, were not the type of records
contemplated by MRE 803(6).

The trial court also incorrectly analyzed the
significance of trustworthiness under MRE 803(6).
The trial court held in effect that, under MRE
803(6), trustworthiness and the presence of a self-
serving motivation to misrepresent were questions
for the jury and did not affect admissibility. We
agree that the credibility and weight to be as-
signed to otherwise admissible evidence is a ques-
tion for the trier of fact. We disagree, however,
that, under MRE 803(6), trustworthiness is not
also a question of admissibility. As the rule and its
theoretical underpinnings indicate, trustworth-
iness is, under MRE 803(6), unlike MCL 600.2146;
MSA 27A.2146, an express condition of admissibil-
ity. The flaw in the trial court's reasoning was
that its analysis was essentially a strict and literal
interpretation of MCL 600.2146; MSA 27A.2146,
which preceded MRE 803(6). Unlike the present
rule, § 2146[22] expressly provided that, once the
appropriate foundation had been established, "[a]ll
other circumstances of the making of such writing
or record including lack of personal knowledge by
the entrant or maker, may be shown to affect its
weight but not its admissibility." Unlike § 2146,
MRE 803(6) now expressly provides that trust-
worthiness is a question of admissibility and is not
an issue solely affecting the weight of the evidence.

We finally note that each exhibit is replete with
multiple layers of hearsay within hearsay.
Plaintiff's exhibit 34A, Sergeant Hall's prelimi-
nary complaint report, is typical, and it recounts a

[22] See n 10 for text.

conversation Sergeant Hall had with Officer Shuell following decedent's shooting. Under MRE 805,[23] hearsay within hearsay is excluded where no foundation has been established to bring each independent hearsay statement within a hearsay exception. See *In re Freiburger,* 153 Mich App 251, 260; 395 NW2d 300 (1986). Although the trial court agreed with plaintiff's counsel that the exhibits were replete with multiple hearsay statements within hearsay, the court nevertheless overruled plaintiff's timely objection. The court reasoned that plaintiff's objection went to the weight and credibility the jury should assign each exhibit. We disagree, however, with the lower court's ruling and reasoning. Because defendant failed to establish an appropriate foundation for each independent hearsay statement to fall within a hearsay exception, most, if not all, of the information contained in each report is inadmissible hearsay and was improperly admitted into evidence.

**B**

Plaintiff-appellant also argues that each exhibit is inadmissible under the public records exception to the hearsay rule. MRE 803(8) excepts from the hearsay rule:

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement per-

---

[23] Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules. [MRE 805.]

sonnel, and subject to the limitations of MCL 257.624; MSA 9.2324.[24]

Because MRE 803(8)(A) is limited to "records or reports" describing the general activities of an agency per se, the four exhibits do not fall within subsection (A) since they relate to a single specific incident. *Attorney General v John A Biewer Co, Inc,* 140 Mich App 1, 16; 363 NW2d 712 (1985); *Hewitt v Grand Trunk W R Co,* 123 Mich App 309, 326-327; 333 NW2d 264 (1983).

The four exhibits are also inadmissible under MRE 803(8)(B), which excepts from the hearsay rule records of matters observed and reported pursuant to a duty. Although the four exhibits do meet the literal requirements of MRE 803(8)(B), they are nevertheless inadmissible because of the circumstances under which they were prepared and because they are replete with multiple layers of hearsay within hearsay.

As with the business records hearsay exception, MRE 803(6), inherent trustworthiness also lies at the heart of the public records hearsay exception codified in MRE 803(8). See FRE Advisory Committee Note, 56 FRD 183, 311 (1972). See also Wigmore, *supra,* §§ 1630-1632, pp 617-621. Chief Justice RILEY, then a Court of Appeals judge, also noted in *Hewitt v Grand Trunk W R Co, supra,*[25] that the rationale giving rise to the traditional public records exception was rooted not merely in the practical necessity of relieving public officials

---

[24] MRE 803(8) is identical to FRE 803(8) except for the reference to MCL 257.624; MSA 9.2324 and the omission of FRE 803(8)(C) (evaluative reports), which was rejected as inconsistent with prior Michigan law. See *Swartz v Dow Chemical Co,* 414 Mich 433, 443-444; 326 NW2d 804 (1982). See also *Bradbury v Ford Motor Co,* 419 Mich 550, 554; 358 NW2d 550 (1984).

[25] In *Hewitt,* the Court concluded in dicta that an accident report prepared by an officer without a duty to report did not fall within the scope of MRE 803(8)(B).

from becoming " 'a class of official witnesses,' " but rather in the high probability that the declarant would properly discharge his duty to make an accurate and reliable report:

> McCormick's treatise on the law of evidence explains the purpose, scope and justification for this exception:
> "The special trustworthiness of official written statements is found in the declarant's official duty and the high probability that the duty to make an accurate report has been performed. . . .
> "A special need for this category of hearsay is found in the inconvenience of requiring public officials to appear in court and testify concerning the subject matter of their statements. Not only would this disrupt the administration of public affairs, but it almost certainly would create a class of official witnesses. Moreover, given the volume of business in public officers, the official written statement will usually be more reliable than the official's present memory." McCormick, Evidence (2d ed), § 315, pp 735-736. [*Hewitt, supra,* p 326.]

Thus, the principle justification for excepting public records from the hearsay rule is trustworthiness, which is generally ensured when records are prepared under circumstances providing an official duty to observe and report.

Our Court of Appeals has previously taken into consideration the circumstances under which documents are prepared in order to determine whether they fall within the public records hearsay exception. In *Attorney General v Biewer, supra,* the Court concluded that documents prepared in anticipation of litigation do not fall within the scope of MRE 803(8)(B) because they lack trustworthiness. At issue in *Biewer* was whether several Department of Natural Resources memoranda, setting forth the costs the agency incurred during the

investigation of defendant's plant for ground water contamination, fell within the scope of MRE 803(8)(B). The Court concluded the memoranda were beyond the scope of MRE 803(8)(B) not merely because there was no specific legal duty imposed on DNR employees to report agency investigative expenditures, but rather because the memoranda were prepared to document the investigatory costs that the DNR sought to recover as damages in a civil lawsuit. 140 Mich App 17. Consequently, the circumstances of preparation indicated the memoranda were prepared for litigation, and "[t]he inherent trustworthiness of documents prepared by a public official in carrying out his duties which justifies the public records exception does not apply to this case." *Id.*

It is clear that under certain circumstances, such as when records are prepared in anticipation of litigation or where the preparer or source of information had a motivation to misrepresent, trustworthiness, the principle rationale for admissibility under MRE 803(8), is no longer present, even though a record may meet the literal requirements of the rule. See Wigmore, *supra,* § 1633(7), p 624.[26] Thus, we again take note of the circumstances under which the four exhibits in the present case were prepared, see *ante,* pp 126-129, and likewise conclude they were improperly admitted into evidence under MRE 803(8)(B). Under MRE 803(8)(B), trustworthiness is the cardinal justification for the admissibility of public records otherwise excluded as hearsay, and the circumstances

[26] Although records meeting the literal requirements of the public records hearsay exception have traditionally been admitted into evidence, "a statement otherwise admissible is to be excluded where there existed for the declarant a special *interest or motive to misrepresent.* No doubt, in a given case, circumstances may justify the exclusion of an official statement where a strong motive to misrepresent appears to have existed . . . ." Wigmore, *supra,* § 1633(7), p 624. (Emphasis in original.)

under which the four exhibits in this case were prepared do not furnish the same high degree of reliability and accuracy that the literal requirements of MRE 803(8)(B) were intended to ensure. Rather than affecting solely the weight of the evidence, the circumstances under which these four exhibits were prepared touch upon the underlying threshold issue of admissibility.

In addition, each record, as previously noted, see *ante,* pp 128-129, also contains numerous statements of hearsay within hearsay. MRE 805. Consequently, we would hold that the four exhibits are inadmissible hearsay and were improperly admitted into evidence under MRE 803(8).

C

The admission of the four exhibits into evidence over plaintiff's timely objection was clearly improper and constituted an abuse of discretion. We also agree with Judge SHEPHERD that the prejudice to plaintiff is obvious. "The reports, given their imprimatur as official police documents, might be viewed as more credible than the testimony of live witnesses. It is impossible to conclude the jury, faced with a quasi-official document which purports to offer an objective recitation of the 'facts,' would not place heavy reliance on its accuracy." 166 Mich App 31 (SHEPHERD, J., dissenting). When added to the fact that the exhibits create the impression that decedent came out of his home specifically intending to shoot someone even though his own son would be endangered, the error cannot be deemed harmless. Because the substantial rights of the plaintiff were adversely affected, automatic reversal is required. *Swartz v Dow Chemical Co,* 414 Mich 433, 444; 326 NW2d 804 (1982); *Ilins v Burns,* 388 Mich 504, 510-511; 201 NW2d 624 (1972).

III

The second question presented is whether the trial court properly instructed the jury on the so-called rescue doctrine. SJI2d 13.07 provides:

> A person who goes to the rescue of another who is in .imminent and serious peril caused by the negligence of someone else is not contributorily negligent, so long as the rescue attempt is not recklessly or rashly made.

Over plaintiff's timely objection, the trial court read to the jury a modified version of SJI2d 13.07:

> If you find, under the facts, from the evidence, that Alvin Solomon was in imminent and serious peril, a person who goes to the rescue of another who is in imminent and serious peril caused by the negligence of someone else, is not contributorily negligent, so long as the rescue attempt is not recklessly or rashly made.

The basis of plaintiff's objection was that the victim need not be in actual danger in order for the rescue doctrine to apply, and that the instructions misled the jury by stating contributory negligence principles instead of comparative negligence principles.

The Court of Appeals affirmed. Although the Court concluded that the trial court had erroneously instructed the jury, the Court deemed the error harmless. The Court held that the rescue doctrine applies if the rescuer reasonably believes the victim is in actual danger. Consequently, the victim need not ever have been in actual danger in order for the doctrine to apply. The Court found the error harmless, however, because on the whole, the jury instructions adequately presented

plaintiff's theory of the case to the jury and properly instructed the jury on comparative negligence principles. Consequently, we must determine whether the Court of Appeals properly held that the trial court erroneously instructed the jury and whether the error was harmless.

A

Under the rescue doctrine, the tortfeasor whose negligence endangers the victim owes the victim's rescuer a duty of reasonable care. *Brugh v Bigelow,* 310 Mich 74, 77, 80; 16 NW2d 668 (1944), citing *Wagner v Int'l R Co,* 232 NY 176; 133 NE 437 (1921); Prosser & Keeton, Torts (5th ed), § 43, pp 288-289, § 44, pp 307-308. Since rescuers, as a class, are foreseeable, the tortfeasor's duty of care owed to the rescuer is independent of that owed to the victim. Prosser & Keeton, *supra,* § 44, p 308.

Traditionally, the rescue doctrine has served two purposes. First, the doctrine established a causal nexus linking the tortfeasor's negligent conduct to the rescuer's injuries. See *Parks v Starks,* 342 Mich 443; 70 NW2d 805 (1955). Consequently, the fact that the rescuer voluntarily exposed himself to an increased risk of harm was not, as a matter of law, deemed to be a superseding cause of the rescuer's injuries that would discharge the tortfeasor's liability. *Sweetman v State Hwy Dep't,* 137 Mich App 14, 26-27; 357 NW2d 783 (1984); Restatement Torts, 2d, § 445; Prosser & Keeton, *supra,* § 44, pp 307-308. Second, the doctrine also provided that, when the rescue attempt itself was reasonable, the rescuer's recovery was not otherwise absolutely barred by the affirmative defense of contributory negligence merely because the rescuer voluntarily exposed himself to an increased risk of injury in order to save a third person.

*Sweetman, supra,* pp 26-27; 2 Restatement Torts, 2d, § 472, p 521; Prosser & Keeton, *supra,* § 44, pp 307-308, § 65, pp 451-453.

An injured rescuer's recovery would still be barred, even if the rescue attempt itself was reasonable, when the rescuer did not exercise reasonable care in the manner in which he carried out the attempt. *Sweetman, supra,* p 27; 2 Restatement Torts, 2d, § 472, comment c, p 522; SJI2d 13.07. Thus, as the Court of Appeals noted in *Sweetman,* the application of the rescue doctrine requires a two-step analysis. First, the trier of fact must determine whether a reasonable person under the same or similar circumstances would have acted as did the rescuer. To determine this, the trier of fact must balance the utility of the rescuer's conduct against the magnitude of the increased risk of harm. See *Moning v Alfono,* 400 Mich 425, 433-434; 254 NW2d 759 (1977); *Sweetman, supra,* pp 26-27. If the rescue attempt itself is reasonable, then the rescuer is not deemed *comparatively* negligent merely for voluntarily exposing himself to an increased risk of harm in order to save another.[27] The second step of the analysis is to determine whether the rescuer carried out the rescue attempt in a reasonable manner. If the rescuer did not, then the rescuer's recovery is reduced by his comparative degree of fault. *Sweetman, supra,* pp 26-27.

The Court of Appeals correctly held that the rescue doctrine applies even if the victim never was in actual danger. Although previous Michigan cases held that the victim had to be in actual

[27] Although in *Placek v Sterling Heights,* 405 Mich 638; 275 NW2d 511 (1979), reh den 406 Mich 1119 (1979), we abolished the contributory negligence doctrine as an absolute bar to a negligent plaintiff's recovery, comparative negligence principles now apply in rescue cases. *Sweetman, supra,* p 26.

danger at the time of the rescue attempt,[28] or if not, at least shortly before,[29] it is clear that the dispositive issue determining whether the rescue attempt itself is reasonable is whether the rescuer acted as a reasonable person under the same or similar circumstances. Because the inquiry as to whether the rescue attempt itself was reasonable also rests upon whether the utility of the rescue attempt outweighs the increased risk of harm the rescuer faces, the Court of Appeals correctly determined that the rescue doctrine applies even if the victim never was in actual danger. Accord Prosser & Keeton, *supra,* § 44, p 306, n 45 and pp 307-308. Because the trial court instructed the jury that Alvin Solomon had to be in actual danger at the time of the rescue attempt, we agree with the Court of Appeals that the instruction was erroneous. Consequently, the instruction was also misleading because it did not clearly charge the jury to undertake its inquiry from the viewpoint of a reasonable person acting under the same or similar circumstances as decedent.[30] See *Sweetman, supra,* pp 26-28.

B

The Court of Appeals deemed the instructional error harmless because it found that the jury instructions as a whole adequately stated plaintiff's theory of the case and, therefore, did not constitute error requiring reversal. See *Baker v Saginaw City Lines, Inc,* 366 Mich 180, 189-190;

[28] See, e.g., *Parks v Starks,* 342 Mich 443; 70 NW2d 805 (1955); *Brown v Ross,* 345 Mich 54; 75 NW2d 68 (1956); *Hughes v Polk,* 40 Mich App 634; 199 NW2d 224 (1972), lv den 388 Mich 770 (1972).

[29] *Sweetman, supra.*

[30] We also agree that the jury instruction was erroneous and misleading because it stated the contributory negligence doctrine instead of comparative negligence principles.

113, NW2d 912 (1962); *Scalabrino v Grand Trunk
W R Co,* 135 Mich App 758, 766; 356 NW2d 258
(1984), lv den 422 Mich 877 (1985). The Court also
reasoned that, because it had reduced plaintiff's
award by eighty percent, the jury must have been
properly instructed on comparative negligence
principles. We disagree and would hold the in-
structional error prejudicial and inconsistent with
substantial justice.[31]

Under the instructions the trial court read to
the jury, the jury could not properly analyze
plaintiff's theory of the case under the rescue
doctrine. Plaintiff's theory of the case was that
the rescue attempt itself was reasonable and that
decedent carried out the rescue attempt in a rea-
sonable manner. In light of the fact that Alvin
never was in actual danger, however, the trial
court in effect told the jury that the rescue doc-
trine did not apply and that the rescue attempt
itself was unreasonable. Consequently, the instruc-
tions precluded the jury from properly considering
whether a reasonable person would have under-
taken a rescue attempt under these same circum-
stances and in the same manner. Thus, it is no
comfort to state that the jury was otherwise prop-
erly instructed on comparative negligence princi-
ples and, notwithstanding the instructional error,
undertook an otherwise proper negligence analy-
sis. The simple fact is that the jury, under these
instructions, could not determine whether the res-
cue attempt itself was reasonable. Thus, plaintiff's
theory of the case was not adequately presented to
the jury. Plaintiff suffered prejudice inconsistent
with substantial justice, and, therefore, reversal is
required.

---

[31] MCR 2.613(A). The harmless error standard set forth in MCR
2.613(A) is applicable in all civil actions. *Johnson v Corbet,* 423 Mich
304, 326; 377 NW2d 713 (1985).

CONCLUSION

As we noted in *Moncrief v Detroit*, 398 Mich 181; 247 NW2d 783 (1976), police reports will not usually qualify for admission into evidence under the business records exception to the hearsay rule.[32] In the present case, we would hold that the four police reports were improperly admitted into evidence under MRE 803(6) because each exhibit lacked the trustworthiness that the rule requires as a condition of admissibility. Each exhibit also contains numerous statements of hearsay within hearsay, MRE 805, and is not otherwise admissible as a public record, MRE 803(8). We also conclude that plaintiff suffered substantial prejudice because of the reports' imprimatur as "official" police records and their depiction of decedent's conduct.

We also would hold that the jury was erroneously instructed on the rescue doctrine. Because the trial court's instructions did not adequately present plaintiff's theory of the case to the jury and the jury could not otherwise undertake a proper negligence analysis, we would hold the error cannot be deemed harmless.[33]

The judgment of the Court of Appeals should be reversed, and the case remanded for a new trial consistent with this opinion.

---

[32] The police report is a writing. It could be admitted into evidence as an exhibit if the proponent can show that it meets the requirements of the business records exception. However, because of the "nature" of police business and the circumstances under which such reports are usually made, the possibility of police reports so qualifying is unlikely. [*Moncrief, supra*, p 189.]

[33] Although the erroneous admission of the four police reports and the instructional error each are independent grounds requiring reversal because plaintiff suffered substantial prejudice, the cumulative effect of these errors also requires reversal. *Haynes v Seiler*, 16 Mich App 98, 103; 167 NW2d 819 (1969). See *Hickey v Zezulka*, 177 Mich App 606, 623; 443 NW2d 180 (1989).

Levin and Cavanagh, JJ., concurred with Archer, J.

Boyle, J. (*concurring*). We concur in the reasoning of the lead opinion regarding the threshold for admissibility under MRE 803(6) and in its conclusion with respect to the admissibility of the police reports and police statements in this case. We concur in the conclusion that these documents were not admissible as public records and reports, but we would so hold on the grounds that the documents fall outside the scope of MRE 803(8)(B) because of their investigative character. In any event, we are convinced that the improper admission of these hearsay statements was error which did not prejudice plaintiff. We agree that the trial court's instruction on the rescue doctrine requires reversal since that instruction, together with the instructions on negligence, may have led the jury to hold Joseph Solomon to a standard of reasonable conduct under the actual circumstances, irrespective of his reasonable belief.

I

While we agree that the police documents in this case were not admissible pursuant to MRE 803(8)(B), we reach that conclusion by a different analysis than that employed by the lead opinion. The documents are not admissible as reports of "matters observed pursuant to duty imposed by law as to which there was a duty to report" because they are not reports of routine matters, but are rather more like the investigative or evaluative reports that the rules committee intended

to exclude in rejecting FRE 803(8)(C).[1]
MRE 803(8) excepts from the ban on hearsay:

> Records, reports, statements, or data compila-
> tions, in any form, of public offices or agencies,
> setting forth (A) the activities of the office or
> agency, or (B) matters observed pursuant to duty
> imposed by law as to which matters there was a
> duty to report, excluding, however, in criminal
> cases matters observed by police officers and other
> law enforcement personnel, and subject to the
> limitations of MCL 257.624; MSA 9.2324.

The drafters of MRE 803(8) chose not to include
the federal section (C) which creates a hearsay
exception for factual findings of public offices or
agencies in civil cases and in cases against the
government.[2]

In *Bradbury v Ford Motor Co,* 419 Mich 550,
553; 358 NW2d 550 (1984), we found that the
history of MRE 803(8) demonstrated that "evalua-
tive and investigative reports are not within the
provision excepting from the hearsay rule 'matters
observed pursuant to duty imposed by law as to
which matters there was a duty to report . . . .' "
The documents involved in this case were clearly
products of a police investigation into the shooting
of Joseph Solomon.[3] These are investigative or

---

[1] FRE 803(8)(C) excepts from the hearsay rule

in civil actions and proceedings and against the Government in
criminal cases, factual findings resulting from an investigation
made pursuant to authority granted by law, unless the sources
of information or other circumstances indicate lack of trust-
worthiness.

[2] This Court has published a proposed amendment of MRE 803(8),
adding a part (C) identical to part (C) of FRE 803(8). 428 Mich 1223,
1224 (1987).

[3] Even the Preliminary Complaint Report, prepared by Shuell on
the day of the incident, was required to be prepared pursuant to the
internal police investigation. Sgt. Bernard Brantley whose duties
included investigations of homicides involving police as perpetrators
or victims, testified that each officer involved was required to prepare
a Preliminary Complaint Report.

evaluative reports which are not admissible as public records or reports under MRE 803(8)(B).

The exclusion of "investigative" reports in *Bradbury* should not be misinterpreted to exclude police reports in general.[4] While any police report could be characterized as "investigative," the drafters of MRE 803(8) obviously did not mean to exclude all police reports in civil actions. To the contrary, the terms of MRE 803(8)(B) suggest that the rule permits admissibility of police reports in civil actions. The rule's express exclusion "in criminal cases, [of] matters observed by police officers and other law enforcement personnel" by negative implication conveys the rulemakers' intention that police reports could be admissible under MRE 803(8)(B).[5]

The reason for the express exclusion of police reports in criminal cases, though, illuminates the reason for exclusion of police reports in the circumstances of this case. A concern with the confrontation rights of an accused is reflected in MRE 803(8)(B), which like the federal rule, excludes "in criminal cases, matters observed by police officers and other law enforcement personnel." The FRE 803(8)(B) exclusion of police reports in criminal

---

[4] The *Bradbury* Court contrasted "investigative" reports, which it held inadmissible, with "reports of objective data observed and reported by [public] officials." *Id.*, p 554. Thus, the Court implicitly noted two reasons for distinguishing between reports which are admissible under MRE 803(8)(B) and those which are inadmissible investigative or evaluative reports: 1) Reports of "matters observed pursuant to duty . . . as to which matters there was a duty to report" are likely to contain firsthand observations, whereas evaluative or investigative reports will more likely be gleaned from hearsay statements; and 2) Reports of "matters observed pursuant to duty . . . as to which matters there was a duty to report" will more likely contain reports of objective information, whereas investigative or evaluative reports contain more subjective information.

[5] The express exclusion from MRE 803(8)(B) of police accident reports pursuant to the terms of MCL 257.624; MSA 9.2324 also suggests that police reports may otherwise be admitted under the rule.

cases was added by House amendment after discussion of whether such reports should be admitted against a defendant who has no opportunity to cross-examine the officer, 4 Weinstein & Berger, Evidence, ¶ 803(8)[01], p 803-238. A related rationale for the exclusion of police reports in criminal matters is that police reports in criminal cases are felt to be unreliable because of the adversarial nature of the confrontation between the police and the citizen in a criminal case.[6] The limitations on FRE 803(8)(C) are similarly shaped largely by concern for the confrontation rights of a criminal defendant. FRE 803(8)(C) makes investigative or evaluative reports admissible only in civil cases or against the government in criminal cases. The committee so limited part (C) "in view of the almost certain collision with confrontation rights which would result" from the use of evaluative reports against a criminal defendant. Advisory Committee Note, FRE 803(8)(C). Clearly, the rulemakers were hesitant to allow the admission of a document which was the product of an adversarial relationship, both because the circumstances of production lessened the likelihood of reliability, and because the admission of such a document would not be fair to a criminal defendant.[7]

[6] The Senate's Judiciary Committee Report put forth the following rationale for the amendment excluding from the scope of MRE 803(B) police reports in criminal matters:

"Ostensibly, the reason for this exclusion is that observations by police officers at the scene of the crime of the apprehension of the defendant are not as reliable as observations by public officials in other cases because of the adversarial nature of the confrontation between the police and the defendant in criminal cases." [4 Weinstein & Berger, Evidence, ¶ 803(8)[01], p 803-238.]

[7] Consistent with the intent of Congress, FRE 803(8)(B) should be interpreted to allow the introduction of police reports of matters observed pursuant to duty *when offered by a criminal defendant.* *United States v Smith,* 172 US App DC 297; 521 F2d 957 (1975).

The history of parts (B) and (C) of FRE 803(8) evidence no intent to exclude routine reports that might be generated during a police investigation, but rather to preclude the admission of reports which might endanger the confrontation rights of a criminal defendant. Thus, matters reported by law enforcement officials are admissible under FRE 803(8)(B) when "the information was recorded by a public official as part of a routine procedure in a non-adversarial setting." *United States v Puente,* 826 F2d 1415, 1418 (CA 5, 1987).[8] Under FRE 803(8)(C), reports resulting from internal police investigations are admitted in civil cases as investigative or evaluative reports. *McQuaig v McCoy,* 806 F2d 1298 (CA 5, 1987); *Perrin v Anderson,* 784 F2d 1040 (CA 10, 1986).

When the drafters of MRE 803(8) omitted part (C) from the rule, they indicated their intent to exclude investigative or evaluative reports from the public records exception, whether in a civil or criminal case. By limiting the MRE 803(8)(B) exception to exclude "in criminal cases matters observed by police officers and other law enforcement personnel," the drafters further indicated their unwillingness to include within the scope of the hearsay exception evidence that would threaten a criminal defendant's right to confrontation. This same limitation, however, suggests by negative implication that police reports arising from routine, nonadversarial situations, are generally admissible in civil cases.[9] Likewise the limitations of

---

[8] See also *United States v DeWater,* 846 F2d 528, 530 (CA 9, 1988) (report of intoxilyzer results was admissible under FRE 803[8] where the preparation of the report was a "routine, non-adversarial act made in a non-adversarial setting"); *United States v Dancy,* 861 F2d 77, 79 (CA 5, 1988) (fingerprint cards were admissible as records documenting "routine, unambiguous factual matters").

[9] Substantial federal authority holds that routine police reports made in a nonadversarial setting are admissible in criminal cases as

Rule 803(8)(B) "will not be extended to other hearsay exceptions if the maker is produced in court as a witness, subject to cross-examination, since the essential purpose of the Congress was simply to avoid uncross-examined evidence." McCormick, Evidence (3d ed), § 316, p 892, and cases cited in n 16.

We would hold that the police documents in this case were investigative reports outside the scope of MRE 803(8)(B). Clearly, they were not routine recordings of routine acts, nor were they created in a nonadversarial setting. However, this is not to say that all "police" reports are generally outside the scope of MRE 803(8)(B). Police documents recording routine matters fall within the scope of the public records hearsay exception.

II

We would find the improper admission of the police documents harmless for three reasons. First, the hearsay statements were merely cumulative of properly admitted testimony. Second, the hearsay declarants, police officers Shuell and Nixon, testified at trial and were subject to cross-examination regarding their prior statements. Finally, some of the hearsay statements were actually favorable to plaintiff with regard to the critical fact issue—whether the officers identified themselves to Joseph Solomon as police.

The threshold for reversal based on evidentiary error is stated in MCR 2.613:

(A) Harmless Error. An error in the admission or the exclusion of evidence . . . is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a

well, *United States v Puente; United States v DeWater; United States v Dancy, supra.* However, that issue is not before us today.

judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.

An error which does not prejudice a party, therefore, is not ground for reversal. An error is prejudicial when it affects the substantial rights of the party. *Ilins v Burns,* 388 Mich 504, 510-511; 201 NW2d 624 (1972); *Swartz v Dow Chemical Co,* 414 Mich 433; 326 NW2d 804 (1982). The burden is on the appellant to show that the error was prejudicial and that the failure to reverse would be inconsistent with substantial justice. *Henson v Veterans Cab Co,* 384 Mich 486, 494; 185 NW2d 383 (1971).

The Court of Appeals and the federal courts repeatedly hold that improperly admitted hearsay evidence constitutes harmless error when it is merely cumulative of other properly admitted evidence. *Duke v American Olean Tile Co,* 155 Mich App 555, 572; 400 NW2d 677 (1986); *People v Miller,* 165 Mich App 32, 50; 418 NW2d 668 (1987); *Kelly's Auto Parts, No 1, Inc v Boughton,* 809 F2d 1247, 1255 (CA 6, 1987); *Hansen v Johns-Manville Products Corp,* 734 F2d 1036, 1040 (CA 5, 1984), cert den 470 US 1051 (1985). A review of the evidence submitted over thirteen days of trial reveals that the statements contained in the improperly admitted police reports and police statements were merely cumulative of properly admitted trial testimony.

The plaintiff argues that exhibit 113, a witness statement by Officer Nixon, was prejudicial to plaintiff's substantial rights. The plaintiff specifically objects to the hearsay statements that Joseph Solomon was holding a gun in two hands extended in front of him and that Joseph Solomon fired the first shot. However, Nixon testified regarding these

same facts at trial and was subject to cross-examination on these matters.

The plaintiff also finds prejudice in the admission of exhibit 34A, a recording of statements by defendant Shuell, because the rendition of events contained therein suggests that Joseph Solomon was attacking Shuell rather than attempting to rescue his son. The exhibit leaves that impression to no greater an extent than does the trial testimony of Officer Shuell—the substance of the statement is the same as Shuell's trial testimony. Because the hearsay statements were merely cumulative of properly admitted testimony, there is no basis to conclude that admission of these statements affected any substantial right of the plaintiff. Defendant Shuell's statement contained in exhibit 122, and his preliminary complaint report, exhibit 121, were likewise merely cumulative of Shuell's testimony at trial.

We do not agree that the reports and statements bore an "imprimatur" as official police documents which rendered them more credible to the jury than the testimony of live witnesses. The jury was well aware that these documents contained the statements of none other than Nixon and Shuell, whose credibility was well tested at trial.[10] To assume that the jury would give greater weight to statements in police documents than it gave to *the very same statements* when rendered at trial *by the declarants* attributes less than a modicum of common sense to the jury.

With respect to exhibit 34A, a supplemental preliminary complaint report containing Shuell's rendition of events immediately surrounding the shooting, plaintiff complains that the statement

[10] The jury was instructed, moreover, that the fact that a person was a police officer would make his testimony no more or less credible than that of any other witness.

contains multiple levels of hearsay which are not independently admissible. The statement does indeed include Shuell's account that Officer Nixon shouted "look out John he's got a gun," and Joseph Solomon, while pointing a gun at Shuell, shouted at his son to get down and get out of the way. Shuell testified with regard to these same statements at trial, and it should be noted that plaintiff's counsel did not object to Shuell's trial rendition of the various statements which are now characterized as hearsay within hearsay. Nor should counsel have objected; the statements by the decedent and by Officer Nixon obviously were not offered to prove the truth of the matters asserted in these statements, but rather to show the knowledge and state of mind of those involved as events unfolded. The documents in question thus do not contain hearsay within hearsay.

In this case, any likelihood of prejudice was greatly diminished by the fact that both declarants were available for cross-examination and were in fact cross-examined at trial. In *Swartz, supra,* p 442, this Court recognized that the primary rationale for the exclusion of hearsay is the inability to test the reliability of out-of-court statements:

> When dealing with a hearsay problem, the emphasis centers upon the condition of cross-examination. Meaningful cross-examination has become a "vital feature" of the Anglo-American legal system. 5 Wigmore, Evidence [Chadbourn rev], § 1367, p 32. Underlying this rationale is the recognition that the value of many out-of-court statements is undercut because of the inability to test by cross-examination the veracity and competency of the out-of-court declarant from whom the witness has gathered his information. See generally Wigmore, § 1362, p 3.

Although neither the federal rules nor Michi-

gan's Rules of Evidence fully adopt Wigmore's reasoning that prior statements of a trial witness should be exempt from the rule barring hearsay, McCormick, Evidence (3d ed), § 251, p 744, the presence of the witness at trial for cross-examination concerning his earlier statement is a valid consideration for the harmless error question. See *People v Martin,* 75 Mich App 6, 16-17; 254 NW2d 628 (1977), lv den 402 Mich 881 (1978); *People v Coppernol,* 59 Mich App 745, 752; 229 NW2d 913 (1975), lv den 398 Mich 803 (1976); *United States v Lawrence,* 699 F2d 697, 704 (CA 5, 1983), cert den 461 US 935 (1983). In this case, the improperly admitted hearsay statements were merely cumulative of the trial testimony of the declarants. Thus, when counsel for plaintiff cross-examined Nixon[11] and Shuell at trial, he effectively challenged their hearsay statements as well.

Finally, it is of some significance to the harmless error inquiry that some of the documents complained of were actually favorable to plaintiff with regard to the critical question whether the officers identified themselves to Joseph Solomon as police officers. At trial, both Shuell and Nixon testified that Nixon yelled "police" as Solomon approached. Defendant Shuell testified that as Solomon approached, Shuell yelled words to the effect of "Drop the gun, police." Yet in his statement, admitted as exhibit 122, Shuell responded, "I don't recall," when asked whether he identified himself as a police officer to Joseph Solomon. Shuell's preliminary complaint report, written on the day of the shooting, contained no mention that either officer identified himself as a police officer to Joseph Solomon. Counsel for plaintiff very capably impeached Shuell with his prior statement and

---

[11] Nixon was called by plaintiff as an adverse witness, MCL 600.2161; MSA 27A.2161.

with his preliminary complaint report. In closing argument, the damaging effect of these documents on defendant's claim that Nixon or Shuell informed Joseph Solomon they were police was effectively emphasized by plaintiff's counsel:

> And do you remember, Defendant Shuell prepared what they call a PCR and a PCR [sic]—and you remember I asked Defendant Shuell, what do you put in a PCR. And you remember he agreed with me that you have to put the important facts in. Don't you think it's important what they did or didn't communicate to Joseph Solomon? And what did he write, what did he write about what Officer Nixon said? He said, "Officer Nixon yelled, 'John, look out, he's got a gun.'" And that's all he wrote. And you're entitled to read this and I think you've read it before. That's all he wrote. And if you didn't read it before, you are certainly entitled to read it when you go in and deliberate. That's all he wrote.
>
> If he would have said, if Nixon would have said, we're police, or identified himself as a police officer to Joe Solomon, don't you think that Officer Shuell would have put that in his PCR, because wasn't that important? He didn't put it in his PCR because it was never said.

The mere potential for prejudice does not warrant reversal. *Swartz; Ilins, supra*. In this case, where the improperly admitted documents were merely cumulative of competent testimony by the declarants who were effectively cross-examined at trial, and where two of the documents were used to plaintiff's advantage on perhaps the most critical question in the case, it cannot be said that plaintiff's substantial rights were affected. Since no prejudice is shown, the erroneous admission of the police documents does not warrant reversal of the jury's verdict.

III

We agree with the lead opinion's conclusion that the erroneous instruction on the rescue doctrine requires reversal of the jury's verdict, but we do not agree that the instruction itself constrained the jury to conclude that Joseph Solomon's rescue attempt was unreasonable.

As the lead opinion explains, the rescue doctrine provides that a rescuer is not deemed comparatively negligent merely for exposing himself to an increased risk of harm in order to save another so long as 1) it is not unreasonable to undertake the rescue, and 2) the rescue is carried out in a reasonable manner.[12] The lead opinion recognizes that the reasonableness of undertaking rescue is measured by the traditional negligence test of balancing the utility of the conduct in question against the increased risk of harm.[13] The fact that the rescue doctrine reflects the same standard which defines negligence was well explained in *Calvert v Ourum,* 40 Or App 511, 516; 595 P2d 1264 (1979):

> The rescue doctrine does not alter the standard of care. It remains the same. The rescue doctrine operates like the emergency doctrine in that it simply applies the reasonable and prudent person standard to a particular set of circumstances. *See* Prosser, Torts, § 33 (4th ed 1971). The question is whether a reasonably prudent person would have acted similarly as the plaintiff did *under the same or similar circumstances.* [Emphasis in original.]

Ordinarily, then, a jury which applied principles of comparative negligence, as the jury did in this case, would have had to apply a standard of reasonableness in determining whether Joseph Solo-

[12] *Ante,* p 136.
[13] *Ante,* p 136.

mon properly undertook to rescue his son. In this case, however, an unfortunate confluence between the incorrect instruction regarding rescue and the wording of the instructions regarding the negligence standard may have led the jury to hold Joseph Solomon to a standard of care defined by circumstances as they actually existed, irrespective of his reasonable belief. The trial court instructed the jury regarding the rescue doctrine as follows:

> If you find, under the facts, from the evidence, that Alvin Solomon was in imminent and serious peril, a person who goes to the rescue of another who is in imminent and serious peril caused by the negligence of someone else, is not contributorily negligent, so long as the rescue attempt is not recklessly or rashly made.

The jury was instructed regarding negligence as follows:

> When I use the word "negligence," I mean the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do, under the circumstances which you find existed in this case. It is for you to decide what a reasonably careful person would do or would not do under the circumstances as you find them to be in this case.
>
> When I use the words "ordinary care," I mean the care a reasonably careful person would use under the circumstances which you find existed in this case. The law does not say what a reasonably careful person would do or would not do under such circumstances. That is for you to decide. It is the duty of the Plaintiff in connection with this occurrence to use ordinary care for his safety. It was the duty of the Defendant in connection with

this occurrence to use ordinary care for the safety of the Plaintiff.[14]

Because the trial court's instruction regarding the rescue doctrine, together with its instructions regarding comparative negligence, could have misled the jury to apply a standard other than reasonable conduct under the same or similar circumstances to the acts of Joseph Solomon, we concur in the reversal and remand for a new trial.

RILEY, C.J., and BRICKLEY, J., concurred with BOYLE, J.

GRIFFIN, J. (*dissenting*). While I concur in parts I and II of the separate opinion of Justice BOYLE, I dissent from the majority's holding that instruction on the rescue doctrine requires reversal.

Although the instruction as given by the trial court was not inconsistent with SJI2d 13.07, I agree that it was technically flawed for reasons recognized in the other opinions.

However, as the Court of Appeals stated:

> [N]ot all instructional error requires reversal. A jury verdict should be vacated only when the error amounts to a defect in the trial such that the failure to set aside the verdict would be inconsistent with substantial justice. *Johnson v Corbet,* 423 Mich 304, 326; 377 NW2d 713 (1985). Jury instructions must be read as a whole and reversal is not required if the theories of the parties and the applicable law were fairly presented to the jury. *Scalabrino v Grand Trunk W R Co,* 135 Mich

---

[14] This instruction consists of SJI2d 10.02 (Negligence of Adult-Definition); SJI2d 10.03 (Ordinary Care-Adult-Definition); SJI2d 10.04 (Duty to Use Ordinary Care-Adult-Plaintiff); SJI2d 10.05 (Duty to Use Ordinary Care-Adult-Defendant). We do not intend to suggest that these instructions are incorrect or misleading in themselves, only that they could be so in combination with the incorrect rescue instruction given in this case.

App 758, 766; 356 NW2d 258 (1984), lv den 422 Mich 877 (1985). A reading of the jury instructions in their entirety in the instant case leads us to conclude that the error was harmless. The jury was instructed on comparative negligence and was told that plaintiff's damages were to be reduced by the amount which they found decedent to have been negligent. The jury found both decedent and Shuell to be negligent, with decedent eighty percent negligent. We believe that the jury's verdict would not have been different had a different instruction been given and that, on the whole, the theories of the parties and the applicable law were fairly presented to the jury. Thus, the error does not warrant reversal. [166 Mich App 19, 27; 420 NW2d 160 (1988).]

Because I conclude that the errors complained of are not grounds for reversal, I would affirm the decision of the Court of Appeals.