*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

WASSAN JAWAD KADHIM,

      Plaintiff-Appellee,

v

ADAM AL EMARA,

      Defendant-Appellant.

UNPUBLISHED
August 4, 2022

No. 358961
Wayne Circuit Court
LC No. 20-104080-DM

---

Before: BOONSTRA, P.J., and GADOLA and HOOD, JJ.

PER CURIAM.

Defendant Adam Al Emara appeals as of right the trial court's judgment of divorce, raising issues regarding the trial court's custody and parenting-time decisions, and division of property. We affirm.

## I. BACKGROUND

Al Emara and plaintiff Wassan Jawad Kadhim were lawfully married in 2012, although they participated in a religious marriage ceremony and began cohabitating in 2003. The parties' parents arranged their marriage. In 2003, Kadhim was 16 years old and Al Emara was 26 years old. They had three children, who were born in 2005, 2006, and 2009. Al Emara did not complete high school or an equivalency program. He worked for Atlas, an electronics business that he owned with other members of his family. Kadhim was still in high school when she and Al Emara began living together. After Kadhim graduated from high school, she enrolled in classes at Henry Ford Community College and later at the University of Michigan in Dearborn. The parties decided that Kadhim would enroll in medical school, and she was subsequently accepted at the American University of Antigua (AUA).

In 2013, the parties and their children moved to Antigua and rented out their home in Dearborn. The parties dispute how Kadhim paid for her medical school tuition. Students at AUA could not obtain federally-guaranteed student loans. Kadhim testified at trial that Al Emara sold his interest in Atlas for $100,000 to fund her education, but he continued to earn wages working for Atlas while he was in Antigua. Al Emara's sister testified that she loaned money to the parties to pay for the family's living expenses and Kadhim's tuition.

-1-

Al Emara was the children's primary caregiver while Kadhim attended medical school. He took the children to and from school, and he would take them to the beach in the evening so that Kadhim could study at home. Al Emara hired a tutor to teach the children the Arabic language and their cultural and religious heritage. After Kadhim completed two years of coursework at AUA, the family relocated to Miami while Kadhim completed two years of clinical rotation. Kadhim incurred significant student loan debt during this period. Al Emara continued to care for the children to allow Kadhim to focus on her education. Kadhim acknowledged at trial that she could not have completed medical school without Al Emara's involvement.

She also testified that Al Emara was abusive and controlling. He would not allow her to study with male colleagues unless he was present, and he did not allow her to exchange greetings or casual conversation with anyone. He questioned her every day about her activities. According to Kadhim, Al Emara periodically physically abused her by slapping her, throwing her against walls, butting his head against her, and sitting on her. On two occasions, Kadhim left Al Emara and returned to her parents' home, but she came back to him after he promised to stop abusing her.

The parties disputed essential facts about Kadhim's relationship with her family. Kadhim testified that Al Emara tried to isolate her from her family. He punished her for texting with and talking to her sisters. Al Emara testified that Kadhim's family was violent and dysfunctional. He stated that her father was physically abusive, that one of her brothers was a heroin addict, and that both were violent. Al Emara testified that Kadhim agreed with him about her family, and she was grateful to him for taking her out of her family situation.

After Kadhim obtained her medical degree, she was offered a residency in pediatrics at the University of Toledo, but turned it down. According to Kadhim, Al Emara forced her to turn it down because he decided that she would be a stay-at-home wife and mother. According to Al Emara, Kadhim turned it down because he would not agree to her demand that she have exclusive control and use of her earnings.

In 2019, Al Emara helped form a duct-cleaning business, Quality Plus, LLC. He and his family members contributed money to purchasing and equipping a truck with a vacuum system. The company began to do some business, but business was disrupted after the COVID-19 pandemic lockdown that began in March 2020.

On April 10, 2020, Al Emara allegedly attacked Kadhim and left the house. He went to stay with his parents. Kadhim called the police. This incident led Kadhim to obtain a personal protection order (PPO) against Al Emara, effective April 13, 2020. Kadhim thereafter filed a complaint for divorce and did not allow Al Emara to have contact with the children. Kadhim also limited the children's phone contact with him. Al Emara moved for a parenting-time order, which the trial court did not grant until September 2020. Al Emara alleged that the children became undisciplined and lazy during their months of separation. He blamed Kadhim for failing to keep the children on a regular schedule of schoolwork and sleeping.

The trial court conducted a bench trial on custody and property division in March 2021. In addition to describing Al Emara's violent and controlling behavior, Kadhim testified that she accepted a residency at the Detroit Medical Center, to begin in September 2021. She sought physical custody of the children because of Al Emara's violent and controlling propensities, which

made his home environment unsuitable. Al Emara denied abusing Kadhim, and sought physical custody because he was the children's primary caregiver during the years that Kadhim was pursuing a medical degree. He also argued that Kadhim's failure to maintain an orderly and structured environment was harmful to the children. He attempted to introduce police reports related to violent incidents involving Kadhim's family, but the trial court excluded the reports as inadmissible hearsay.

The trial court found that Kadhim's testimony regarding domestic violence was credible. It awarded the parties joint legal custody of the children, but awarded physical custody to Kadhim, with parenting time for Al Emara every Wednesday evening and on alternate weekends, subject to Al Emara's participation in a domestic-violence prevention program. The court also compensated Al Emara for his financial contributions to Kadhim's education, but denied him compensation for his intangible contributions on the ground that his domestic violence diminished his equitable claim. The court valued Al Emara's interest in Quality Plus, LLC, at $48,000. Al Emara moved for modification of the custody order to expand his parenting time, but the trial court denied his motion. Al Emara now appeals.

## II. STANDARDS OF REVIEW

"There are three different standards of review applicable to child custody cases." *Sinicropi v Mazurek*, 273 Mich App 149, 155; 729 NW2d 256 (2006). The trial court's factual findings regarding an established custodial environment and the statutory best-interest factors "are reviewed under the great weight of the evidence standard and will be affirmed unless the evidence clearly preponderates in the opposite direction." *Id*. (quotation marks and citations omitted). This Court defers to the trial court's determination of the witnesses' credibility. *Id*. The trial court's "discretionary rulings, such as the court's determination on the issue of custody, are reviewed for an abuse of discretion." *Id*. The trial court's decisions regarding questions of law "are reviewed for clear legal error." *Id*.

"Orders concerning parenting time must be affirmed on appeal unless the trial court's findings were against the great weight of the evidence, the court committed a palpable abuse of discretion, or the court made a clear legal error on a major issue." *Luna v Regnier*, 326 Mich App 173, 180; 930 NW2d 410 (2018) (quotation marks and citation omitted).

A trial court's evidentiary rulings are reviewed for an abuse of discretion. *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 333 Mich App 457, 477; 960 NW2d 186 (2020). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id*. at 477-478 (quotation marks and citation omitted). Preliminary and underlying questions of law are reviewed de novo. *Id*. at 478. The trial court necessarily abuses its discretion when its determination is not legally correct. *Id*.

"In deciding issues on appeal involving division of marital property, this Court first reviews the trial court's findings of fact." *Butler v Simmons-Butler*, 308 Mich App 195, 207; 863 NW2d 677 (2014). Findings such as the trial court's valuations of marital assets "will not be reversed unless clearly erroneous." *Id*. at 207-208. If the trial court's findings are not found to be erroneous, this Court will determine whether the dispositive ruling was fair and equitable in view of those

facts. *Id.* at 208. "The dispositional ruling is discretionary and will be affirmed unless this Court is left with a firm conviction that the division was inequitable." *Id.*

## III. CUSTODY OF MINOR CHILDREN

Al Emara first argues that the trial court erred by awarding Kadhim sole physical custody of the minor children. We disagree.

"The Child Custody Act, MCL 722.21 *et seq.*, applies to all circuit court child custody disputes and actions, whether original or incidental to other actions." *Marik v Marik*, 325 Mich App 353, 359; 925 NW2d 885 (2018) (quotation marks and citations omitted). In deciding a dispute over the custody of minor children, "[t]he threshold determination is whether an established custodial environment exists." *Id.* at 360, 362. "The established custodial environment is the environment in which over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." *Id.* at 361 (quotation marks and citation omitted). "An established custodial environment may exist in more than one home and can be established as a result of a temporary custody order, in violation of a custody order, or in the absence of a custody order." *Id.* (quotation marks and citation omitted). The party seeking change of an established custodial environment must prove by clear and convincing evidence that the change is in the child's best interests. *Id.* If the court finds that an established custodial environment does not exist, the court may change custody if the party proves by a preponderance of the evidence that the change is in the child's best interests. *Id.*

The trial court found that an established custodial environment existed with Kadhim. The court cited evidence that the children had resided in the marital home with Kadhim since the family returned to Michigan in 2018. Kadhim was a consistent presence in the home during that time, while Al Emara worked outside the home. The court acknowledged that Al Emara was a stay-at-home parent when the family previously lived in Antigua and Florida, but it focused on the more recent period. The court's finding that an established custodial environment existed with Kadhim is not against the great weight of the evidence. *Sinicropi*, 273 Mich App at 155. The evidence established that there had been a substantial shift in the parents' comparative apportionment of parental responsibilities, and it gave greater weight to the environment that had been established in the most recent years. The court did not err by weighing the evidence in this manner.

Where, as here, an established custodial environment is found to exist, the court may not change custody unless the court considers all the statutory best-interest factors in MCL 722.23 and finds by clear and convincing evidence that the change is in the child's best interests. *Griffin v Griffin*, 323 Mich App 110, 119-120; 916 NW2d 292 (2018). MCL 722.23 provides:

> As used in this act, "best interests of the child" means the sum total of the following factors to be considered, evaluated, and determined by the court:
>
> (a) The love, affection, and other emotional ties existing between the parties involved and the child.
>
> (b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

-4-

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(l) Any other factor considered by the court to be relevant to a particular child custody dispute.

Al Emara challenges the trial court's finding that Factor (a) "slightly" favored Kadhim. He argues that this finding was contradicted by Kadhim's admission that Al Emara and the children loved each other. He asserts that the court's opinion was based solely on a custody evaluation by the Family Assessment, Mediation & Education (FAME) department in which the FAME evaluator stated that the children appeared more relaxed with Kadhim. Al Emara argues that the FAME evaluator's opinion was not significant because neither party called the evaluator as a witness and because the arrangements for the remote interviews were slanted in Kadhim's favor. Although Kadhim indicated that Al Emara and the children loved each other, the court's finding is consistent with Kadhim's additional testimony that she believed that the children favored her. The court's finding that Factor (a) "slightly" favored Kadhim is not against the great weight of the evidence.

The trial court found that Factor (b) favored Kadhim because Al Emara's abuse of her made him a poor role model and because Kadhim was better able to assist the children with their homework. Al Emara argues that the trial court's finding about domestic violence is speculative. He argues that Kadhim's choices regarding the children's schooling, cultural education, and

Islamic observances made her less able to facilitate the children's education and religion. The parties presented a great deal of testimony about these matters, which created a wide range of findings that were acceptable under the great-weight-of-the-evidence standard. The court's finding is not against the great weight of the evidence, especially in consideration of the seriousness and pervasiveness of Al Emara's abusive conduct, and the children's changing needs as they mature.

Al Emara argues that the trial court erred by finding that Kadhim was better able to provide a stable environment. He downplays the evidence of his own domestic violence and emphasizes evidence of dysfunction in Kadhim's family. He argues that Kadhim's failure to maintain a structured household caused the children to become lazy and disorganized. Again, the testimony regarding all aspects of the family members' lives could support a wide range of conclusions regarding which home environment is more satisfactory. The evidence supports the trial court's finding that Al Emara's violent and controlling tendencies contributed to an unsatisfactory environment that should not continue. Al Emara argues that there was no evidence that he abused Kadhim in the children's presence, but Kadhim testified that violence occurred when the children were present, including during the incident that led Kadhim to obtain the PPO against Al Emara.

Al Emara raises similar arguments regarding Factor (e), permanence of the family unit. The trial court did not err by finding that Al Emara failed to show that Kadhim's family was dangerous to the children. Al Emara's argument regarding the stability and suitability of the home environment depends on discounting Kadhim's testimony regarding domestic abuse and focusing primarily on Al Emara's criticisms of Kadhim's management of the children during the five months following his departure from the marital home. The possibility that the court could have weighed the evidence differently, but did not, does not establish error.

Regarding Factor (f), moral fitness, Al Emara argues that the trial court improperly speculated that he would become violent toward the children if they rebelled against his authoritarian approach. Al Emara argues that there was no evidence that he reacted violently toward the children when they resisted his authority after he resumed parenting time. The court did not err by finding that Al Emara's controlling and violent tendencies were proof of his moral unfitness, notwithstanding that Kadhim had been the only recipient of his conduct to date.

Al Emara does not directly address Factor (h), the home, school, and community record of the children, but his repeated arguments regarding the children's poor academic record express his clear disagreement with the court's finding. Al Emara's admission that the children's grades were improving supports the trial court's finding that the parties were equal on this factor, however. Moreover, the unusual and difficult circumstances of remote school during the COVID-19 pandemic militate against a finding that the children's academic decline was mainly Kadhim's fault.

Al Emara disputes the trial court's finding regarding Factor (j) on the ground that Kadhim denied him parenting time from April 2020 until September 2020. He argues that Kadhim's alleged concern of parental kidnapping was not credible because she had the children's passports and international travel was restricted during the pandemic. Al Emara's argument overlooks the possibility of absconding with the children within the United States. The trial court also considered that there was no parenting-time order until September 2020. The disputes between Kadhim and

Al Emara over the details of the parenting-time order do not establish a pattern by Kadhim of obstructing Al Emara's parenting time.

Al Emara does not challenge the trial court's finding that Factor (k), domestic violence, favored Kadhim.

In sum, Al Emara fails to demonstrate that the trial court's factual findings with respect to the existence of an established custodial environment and the statutory best-interest factors are contrary to the great weight of the evidence. In light of those findings, the trial court did not abuse its discretion by awarding physical custody of the children to Kadhim. Therefore, we affirm the trial court's custody order.

## IV. PARENTING TIME

Al Emara argues that the parenting-time provisions in the court's judgment are unjustifiably restrictive and that the court erred by denying his posttrial motion to modify the ordered custody provisions. We disagree.

The trial court should grant parenting time "in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time." *Luna*, 326 Mich App at 180 (quotation marks and citation omitted). A trial court may modify a previous child custody judgment or order "for proper cause shown or because of change of circumstances . . . ." MCL 722.27(1)(c). Any such modification also requires "clear and convincing evidence that it is in the best interest of the child." *Id*. "[P]roper cause means one or more appropriate grounds that have or could have a significant effect on the child's life to the extent that a reevaluation of the child's custodial situation should be undertaken." *Vodvarka v Grasmeyer*, 259 Mich App 499, 511; 675 NW2d 847 (2003). A change of circumstances means "conditions surrounding custody of the child, which have or could have a significant effect on the child's well-being, have materially changed." *Id*. at 513-514 (emphasis omitted).

Al Emara argues that the trial court should have granted him more expansive parenting time, especially on weekday evenings, because Kadhim's work hours will make her unavailable to her children. Al Emara's reasons for seeking modification of the trial court's parenting-time order in his posttrial motion were essentially the same reasons that he argued supported his request for custody or broad parenting time at trial, namely, Kadhim's demanding work schedule, her purportedly lax discipline, her dangerous family, and her alleged alienation of the children from him. Al Emara's posttrial motion raised new allegations of how Kadhim interfered with his parenting time. The trial court considered these matters in its July 28, 2021 opinion, but concluded that Al Emara's history of domestic abuse justified the award of physical custody for Kadhim and limited parenting time for Al Emara. The trial court did not abuse its discretion by deciding that Al Emara's new allegations did not warrant modifying that custody and parenting-time arrangement in light of Al Emara's history of domestic abuse against Kadhim.

Al Emara also argues that he could have disproved Kadhim's testimony that she will have a consistent work schedule of 7:00 a.m. to 3:00 p.m. if the trial court had allowed him to discover Kadhim's employment records. Kadhim's testimony was based on her anticipated work schedule, however, and she admitted that she did not know if her schedule would change as she worked in

different rotations. Al Emara's mere belief that Kadhim's employment might impede her ability to provide appropriate care for the children such that he should be awarded expanded parenting time, absent actual evidence to this effect, does not establish that the trial court abused its discretion with respect to parenting time. If Kadhim's work obligations materially change in the future and have a significant effect on the children's well-being, Al Emara can raise that issue then in an appropriate motion.

## V. EXCLUSION OF POLICE REPORTS

Al Emara next argues that the trial court abused its discretion by precluding him from introducing police reports pertaining to incidents involving Kadhim's family members, based on Kadhim's hearsay objections. We disagree.

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Generally, hearsay is not admissible except as provided by the rules of evidence. MRE 802. "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." MRE 805. It is well established that police reports are generally inadmissible hearsay. *In re Forfeiture of a Quantity of Marijuana*, 291 Mich App 243, 254; 805 NW2d 217 (2011).

Al Emara argues that the police reports were admissible under the exception in MRE 803(8) for

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, and subject to the limitations of MCL 257.624.

Although police reports may be admissible under MRE 803(8), that exception applies only to reports made in a setting that is not adversarial to the individual being investigated. *People v McDaniel*, 469 Mich 409, 413; 670 NW2d (2003). In *McDaniel*, after observing that a routine police report is admissible if it is made in a nonadversarial setting, the Supreme Court held that because the police report there "helped establish an element of the crime by use of hearsay observations made by police officers investigating the crime, the report [could not] be admitted under MRE 803(8)." *Id*.

In *Solomon v Shuell*, 435 Mich 104, 108; 457 NW2d 669 (1990), the Supreme Court held that the trial court erred by admitting into evidence four police reports in a wrongful-death action against the defendant police officers. The officers shot the decedent, who approached the plainclothes officers with a gun as the officers struggled with the decedent's son. *Id*. at 110. Two of the exhibits were "police department homicide witness statements taken during the police department investigation of the death." *Id*. at 113. The other two were "preliminary complaint reports, the initial report an officer writes detailing his actions during a particular assignment." *Id*. After concluding that the exhibits were inadmissible under MRE 803(6), *id*. at 114-129, the

Supreme Court held that the police reports were also inadmissible under MRE 803(8)(B), *id.* at 129-133. Although the exhibits satisfied "the literal requirements of MRE 803(8)(B)," they were inadmissible "because of the circumstances under which they were prepared and because they are replete with multiple layers of hearsay within hearsay." *Id.* at 130. The Court noted that, as with the exception in MRE 803(6), "inherent trustworthiness . . . lies at the heart of the public records hearsay exception codified in MRE 803(8)." *Id.* The Court found that the motivation of the officers to misrepresent information in the reports made the records untrustworthy. *Id.* at 132-133. Thus, the *Solomon* Court held that in certain circumstances, including when a record is prepared "in anticipation of litigation or where the preparer or source of information had a motivation to misrepresent, trustworthiness . . . is no longer present, even though a record may meet the literal requirements of the rule." *Id.* at 132.

The trial court correctly excluded the police reports. On their face, the police reports offered in this case satisfy the "literal requirements of MRE 803(8)(B)." *Solomon*, 435 Mich at 130. They are reports created to set forth the officers' activities in responding to dispatches and recorded the officers' observations as they carried out their duties. The custody hearing was not a criminal proceeding, and there is no indication that any of the officers had motivations affecting their trustworthiness. Nor could the officers predict that the incidents could become relevant to a future custody dispute. Thus, on their face, the police reports arguably satisfied the "literal requirements of MRE 803(8)(B)." *Id.*

The witness statements that the officers recorded in the reports were, however, an additional layer of hearsay not covered by the public-records exception. See MRE 805. For example, in the report dated November 28, 2016, the narrative section states, "Dispatch advised the caller was reporting his son was inside with a knife and the son stated to his father that we had a gun." The officer spoke with the father, who "advised [the officers] that he never saw his son armed with a knife or a gun." The son denied threatening to harm his father, but suggested that his father should go to another family member's home for the night. The report dated April 20, 2019, stated that the police found a subject lying on a lawn with a bloody mouth. The subject initially told the officers that he was "sucker punched" by an unknown person, but later stated that his brother assaulted him because he was angry with his brother for arguing with their father. The statements that the witnesses made to the officers were not statements made by public agents in the course of their duties. Rather, Al Emara sought to introduce the police reports to prove the truth of the violent incidents as reported by Kadhim's family members. "When the document to be admitted contains a second level of hearsay, it must also qualify under an exception to the hearsay rule." *Maiden v Rozwood*, 461 Mich 109, 125; 597 NW2d 817 (1999). Al Emara failed to establish that the witnesses' statements were admissible under any exception to the hearsay rule. Therefore, the trial court did not abuse its discretion by excluding the reports from evidence.

We also note that, had Al Emara wished to present evidence regarding the incidents with Kadhim's family members, he could have called as witnesses at trial the police officers who responded to the various incidents. He failed to do so.

## VI. KADHIM'S MEDICAL DEGREE

Al Emara argues that the trial court erred by failing to fairly compensate him for the financial and intangible contributions he made to enable Kadhim to obtain her medical degree. We disagree.

In *Postema v Postema*, 189 Mich App 89, 94; 471 NW2d 912 (1991), this Court held that, in a divorce, a nonstudent spouse may be compensated when the other spouse has earned an advanced degree and the nonstudent spouse assisted the other spouse in obtaining that degree. Such an award "is premised upon both general notions of 'fairness' and the existence of a 'concerted family effort.' " *Id.* at 94-95. "[T]he concept 'concerted family effort' stresses the fact that it is not the existence of an advanced degree that gives rise to an equitable claim for compensation, but rather the fact of the degree being the end product of the mutual sacrifice, effort, and contribution of both parties as part of a larger, long-range plan intended to benefit the family as a whole." *Id.* at 95. When a spouse earns a degree through a concerted family effort, "both spouses expect to be compensated for their respective sacrifices, efforts, and contributions by eventually sharing in the fruits of the degree." *Id.* Divorce precludes the nonstudent spouse from receiving the benefits of the student spouse's degree. "Therefore, a remedy consistent with fairness and equity requires that an attempt be made to at least return financially to the nonstudent spouse the value of what that spouse contributed toward attainment of the degree." *Id.*

In this case, the trial court found that Al Emara made significant intangible contributions toward Kadhim's attainment of her medical degree. Specifically, Al Emara found a school for Kadhim to attend, relocated the family to Antigua and Florida, and assumed childcare responsibilities while Kadhim attended school so that she could focus on her degree. The court found, however, that Al Emara's financial sacrifices were "less clear" because he maintained connections with Atlas, contrary to his testimony that he permanently severed the relationship. The court nonetheless concluded "that there was a concerted family effort involving mutual sacrifice, effort, and contribution of both parties" that enabled Kadhim to earn a medical degree, "thereby creating a valid equitable claim for [Al Emara] regarding [Kadhim's] degree." The court found that "almost $90,000 of the marital income was spent while the parties were in Antigua and Florida," one-half of which was attributable to Al Emara.

Recognizing that Al Emara had not yet "shared any of the fruits of the degree," the court concluded that this circumstance increased the value of his equitable claim. The court further found, however, that Al Emara's equitable claim was diminished by the extent of domestic violence. With these considerations in view, the trial court ordered a division of property that awarded Al Emara 100 percent of the cryptocurrency asset, which, at the time, was valued at approximately $50,000, and 100 percent of his interest in Quality Plus, valued at $48,000. By granting Al Emara the half of these assets that would otherwise go to Kadhim, the court awarded Al Emara an additional $49,000, which "more than covers [his] $45,000 financial contribution to attainment of the medical degree." Al Emara was also compensated for his intangible contributions by discounting his child support obligation. Furthermore, the court found that Kadhim incurred more than $200,000 in student loan debt to obtain her medical degree, and it held her solely responsible for repayment of that debt. Thus, although Al Emara was unable to realize the benefits of Kadhim's degree because of the divorce, he was relieved of a significant financial burden related to the attainment of that degree.

Al Emara enumerates six factors that he contends the trial court disregarded in its assessment of his financial and intangible contributions. Regarding financial contributions, he refers to "tens of thousands of debt borrowed from [his] family" and his relinquishment of his interest in Atlas. Two other factors are partly financial in nature, namely, his "abandonment of his career or further education for almost 10 years" and his "financial and time commitment to assisting" Kadhim in earning her degree. Al Emara asserts that the trial court's division of the debt to his sister was erroneous because Kadhim was the sole beneficiary of her degree. Al Emara argues that the trial court did not consider how much of these funds were used toward Kadhim's medical school expenses. According to Al Emara, the court also did not consider that Kadhim's education was the family's only reason for relocating to Antigua. Al Emara argues that the court erroneously attributed only half of his Atlas income and the rental income to Kadhim's studies in Antigua, without regard to tuition costs and the higher cost of living in Antigua.

The trial court did not wholly disregard these factors. The court did not give credence to Al Emara's testimony that he fully relinquished his interest in Atlas because that testimony was inconsistent with other evidence, such as the loan from his sister and his continued involvement with Atlas. There was also conflicting evidence regarding the compensation Al Emara received for his share of Atlas. Al Emara's argument suggests that the entirety of the parties' resources and income were devoted to Kadhim's education in Antigua, notwithstanding that the family would have had living expenses regardless of where they lived or whether Kadhim was enrolled in school. The family also incurred expenses for the children's private school tuition and Arabic lessons.

Al Emara argues that the trial court failed to give due consideration to other loans his family members made to support Kadhim's education, and that it erred by underestimating Al Emara's financial contributions to Kadhim's degree. We disagree. The trial court considered this evidence, but noted that Al Emara's family conducted numerous financial transactions among themselves without consistent documentation. Al Emara further argues that he forewent career and educational opportunities to allow Kadhim to pursue her medical degree. Al Emara testified that when he was employed as a military translator in Iraq, he came home early and gave up the opportunity to obtain a higher security clearance because Kadhim wanted him to come home. This occurred before Kadhim enrolled in medical school, however, and Al Emara did not testify regarding any other plans that he abandoned on Kadhim's behalf.

Al Emara also argues that the trial court failed to consider the uprooting of the family and his increased responsibility for childcare and housekeeping. As indicated earlier, the trial court considered that Al Emara facilitated Kadhim's education by accepting a majority of the childcare responsibility and running the household. The court offset Al Emara's nontangible contributions against his physical and psychological abuse of Kadhim, however. See *Welling v Welling*, 233 Mich App 708, 711; 592 NW2d 822 (1999) (noting the appropriateness of considering "the conduct of the parties during the marriage" when distributing marital assets). Both the nontangible contributions and his abuse are nonquantifiable. Moreover, Al Emara's argument, that he should have been compensated more for the anticipated benefits of Kadhim's degree, ignores that he was relieved of a significant financial burden that was incurred to obtain that degree when the court held Kadhim solely responsible for repayment of the significant student loan debt of more than $207,000. Al Emara also argues that the trial court failed to explain why it did not order repayment of all funds borrowed from his family. The trial court explained, however, that there was insufficient evidence of family loans other than the loan by one sister. The trial court's balancing

of all of these considerations does not leave us with a firm conviction that the court erred in fashioning an equitable award related to Kadhim's medical degree.

## VII. VALUATION OF QUALITY PLUS

Finally, Al Emara argues that the trial court erred by attributing loans from his family members to Quality Plus as assets belonging to the company, and thereby assigning a value of $48,000 to this marital asset. We disagree.

Al Emara's specific objection to the court's finding is that $45,000 of the $50,000 contributions that the trial court attributed to his share consisted of debts to his family members that were actually liabilities to Quality Plus. The trial court declined to find that the $50,000 in contributions were debts because there were no promissory notes or other documentation showing the contributors' expectations of repayment. Kadhim argues that these findings were justified because of the general pattern of imprecision surrounding Al Emara's intrafamilial transactions. Al Emara did not claim that his family members and friends acquired equity in Quality Plus in exchange for their contributions. He did not produce evidence of loans. Under these circumstances, we cannot conclude that the trial court clearly erred by valuing Al Emara's ownership interest at $48,000, not offset by debts.

We affirm.

/s/ Mark T. Boonstra
/s/ Michael F. Gadola
/s/ Noah P. Hood

-12-